In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR No. 26 CONCERNING SCHOOL IMPACT FEES:

Francis B. Howes, III, Petitioner,

and

Rebecca Lennahan, Victoria Buckley, and Richard Westfall, Title Board,

and

Dan Hayes and Regina Macy, Respondents.

No. 97SA273.

Supreme Court of Colorado, En Banc.

Feb. 17, 1998.

Susan E. Burch, Denver, for Petitioner.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, for Title Board.

Dan Hayes, Arvada, Pro Se.

Justice BENDER delivered the Opinion of the Court.

The petitioner, Francis B. Howes, III ("Howes"), a registered elector of Colorado, brings this original proceeding pursuant to section 1–40–107(2), 1 C.R.S. (1997), to review the title, ballot title, submission clause, and summary (titles and summary) formulated by the respondent, the Title Board ("the Board"), for a proposed initiative constitutional amendment designated "1997–98 # 26" ("the initiative"). We hold that the statute does not prohibit the Board from meeting during the summer months and, therefore, the Board possessed jurisdiction to set the titles and summary for the initiative in July and August 1997. We additionally hold that the titles and summary fairly express, without prejudice, the intent and meaning of the initiative. However, we hold that the Board's fiscal impact statement regarding the initiative is inadequate. We therefore affirm the action of the Board in part, reverse in part, and remand this matter to the Board with directions to obtain and include in its summary the required fiscal impact information concerning school districts.

## I.

Through the proposed initiative, the proponents seek to add the following new section, section 17, to article IX of the Colorado Constitution:

Be it enacted by the People of the State of Colorado:

Article IX of the Constitution of the State of Colorado is amended by the addition of a new Section 17, to read:

Section 17. School Impact Fees. No state or local government tax revenues, property taxes or any other state or local public funds except impact fees assessed upon newly constructed housing units shall be used to construct, expand, equip including school buses, or upgrade public elementary, middle or high schools necessitated by the increased student population from these newly constructed housing units, as housing units are defined by the United States bureau of the census. Fair and adequate school impact fees shall be determined by each school district and shall be sufficient to pay all salaries and benefits for necessary personnel for one year to attain or maintain proper ratios of all personnel needed by a school district because of the increased student population from newly constructed housing units.

The proponents filed the draft initiative with the secretary of state for consideration by the Title Board on July 3, 1997. The Board set the titles and summary for the proposed initiative on July 16, 1997. Howes filed a motion for rehearing in accordance with section 1–40–107(1), 1 C.R.S. (1997),[1] arguing that the Board lacked jurisdiction to act between the third Wednesday in May and the first Wednesday in December and alleging various defects in the titles and summary. Upon rehearing on August 6, 1997, the Board slightly amended the titles and summary. Howes filed this appeal on August 8, 1997, pursuant to section 1–40–107(2), 1 C.R.S. (1997).[2]

Howes challenges the Board's titles and summary determination on three grounds: (1) the Board does not have jurisdiction to set the titles and summary for any proposal between the third Wednesday in May and the first Wednesday in December in any year and therefore was without jurisdiction to set the titles and summary on July 16, 1997, or to amend the titles and summary on August 6, 1997; (2) the titles and summary are misleading because they fail to express correctly and fairly the true intent and meaning of the proposal, and the titles and summary create prejudice through the use of a prohibited "catch phrase"; and (3) the summary omits information basic to the understanding of the fiscal impact of the initiative. The titles and summary determined by the Board are attached as an appendix to this opinion.

## II.

We first address the question of whether the Board may meet during the summer months. As background for our decision we consider the relevant statutory and case law principles governing the role of the Board in the initiative process.

## A.

As we have stated, "The power of initiative is a fundamental right at the very core of our republican form of government." *McKee v. City of Louisville*, 200 Colo. 525, 616 P.2d 969, 972 (1980). This view of the initiative process is consistent with decisions of the

---

**1.** Section 1–40–107(1), 1 C.R.S. (1997), provides in relevant part:

Any person presenting an initiative petition or any registered elector who is not satisfied with the titles, submission clause, and summary provided by the title board and who claims that they are unfair or that they do not fairly express the true meaning and intent of the proposed state law or constitutional amendment may file a motion for a rehearing with the secretary of state within seven days after the titles and summary are set.

**2.** Section 1–40–107(2), 1 C.R.S. (1997), provides in relevant part:

If any person who filed a motion for rehearing pursuant to subsection (1) of this section is overruled by the title board, then the secretary of state shall furnish such person, upon request, a certified copy of the petition with the titles, submission clause, and summary of the proposed law or constitutional amendment, together with a certified copy of the motion for rehearing and of the ruling thereon. If filed with the clerk of the supreme court within five days thereafter, the matter shall be docketed as a cause there pending, which shall be placed at the head of the calendar and disposed of summarily. . . .

United States Supreme Court and the Tenth Circuit refusing to uphold state-imposed limitations on the ability of proponents to circulate initiative petitions. *See Meyer v. Grant*, 486 U.S. 414, 420, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988) (declaring unconstitutional Colorado's prohibition against paying circulators of initiative petitions); *American Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1100 (10th Cir.1997) (declaring unconstitutional a Colorado statute requiring circulators to be registered electors).

■ With this underlying principle in mind, we proceed to examine the statutory scheme governing the initiative process. The General Assembly has provided a detailed procedure for placing initiatives on the election ballot. The Board holds regular meetings on the first and third Wednesdays of each month. At these meetings the Board addresses draft initiatives or motions for rehearing filed with the secretary of state. *See* § 1–40–106(1), 1 C.R.S. (1997). The purpose of these meetings is to set titles and summaries for proposed ballot initiatives. *See id.* The initiative proponent must submit a draft to the secretary of state at least twelve days before the meeting at which the draft is to be considered. *See id.* After the Board sets the titles and summary, the proponent has six months to obtain the requisite number of signatures from registered electors and to file a petition with the secretary of state. *See* §§ 1–40–108, 1 C.R.S. (1997); Colo. Const. art. V, § 1(2). This petition must be filed at least three months prior to the election in which the initiative is to be voted on. *See* Colo. Const. art. V, § 1(2). The secretary of state then verifies the petition's signatures. *See* §§ 1–40–116 to –117, 1 C.R.S. (1997). Following any challenges to the sufficiency of the petition's signatures and the manner in which they were verified, the secretary of state must certify the initiative to be placed on the ballot. *See* § 1–40–122, 1 C.R.S. (1997). The sole power to place an initiative on a statewide ballot is vested with the secretary of state alone, and the Board's authority is limited to setting titles, summaries, and fiscal statements for proposed initiatives. *See Byrne v. Title Board*, 907 P.2d 570, 575 (Colo.1995); *In re Election Reform Amendment*, 852 P.2d 28, 33 (Colo.1993); *In re Workers Comp Initiative*, 850 P.2d 144, 145 (Colo.1993).

### B.

The Board possesses the authority to set its own schedule for meetings, in compliance with statutory limitations. The statutory framework for the Board's meetings is set forth in section 1–40–106(1), 1 C.R.S. (1997), which provides:

> For ballot issues, beginning with the first submission of a draft after an election, the secretary of state shall convene a title board consisting of the secretary of state, the attorney general, and the director of the office of legislative legal services or the director's designee. The title board, by majority vote, shall proceed to designate and fix a proper fair title for each proposed law or constitutional amendment, together with a submission clause, at public meetings to be held at 2 p.m. on the first and third Wednesdays of each month in which a draft or a motion for reconsideration has been submitted to the secretary of state. To be considered at such meeting, a draft shall be submitted to the secretary of state no later than 3 p.m. on the twelfth day before the meeting at which the draft is to be considered by the title board. *The first meeting of the title board shall be held no sooner than the first Wednesday in December after an election, and the last meeting shall be held no later than the third Wednesday in May in the year in which the measure is to be voted on.*

(Emphasis added.) Under this statute, the Board is subject to two specific prohibitions with regard to the timing of its meetings: (1) the Board may not meet between an election and the first Wednesday in December in any year in which an election is held, and (2) the Board may not meet after the third Wednesday in May to consider measures that will be voted on in the upcoming November election.

■ The purpose of these limitations is to ensure that proposed initiatives are considered promptly by the Board well in advance of the date by which the signed petitions must be filed with the secretary of state. *See In re Rights of the Public to Uninter-*

*rupted Service by Public Employees,* 200 Colo. 141, 145, 613 P.2d 867, 870 (1980). Consistent with the principle of allowing sufficient time for the initiative process, we have stated that there is no limit as to how early a petition for an initiative can be filed or circulated prior to an election as long as the process is started after the previous general election. *See Workers Comp Initiative,* 850 P.2d at 145.

This case concerns the second prohibition of section 1–40–106(1) mandating that the Board's "last meeting shall be held no later than the third Wednesday in May in the year in which the measure is to be voted on." The year in which the measure is to be voted on will depend in part upon the initiative's subject matter. Prior to 1992, initiatives could only be placed on the ballot in even-numbered, or general election years. *See* Colo. Const. art. V, § 1. In 1992, Amendment 1 became part of our constitution, permitting statewide elections for limited purposes to be held in odd-numbered years as well as even-numbered years. *See* Colo. Const. art. X, § 20(3)(a) ("Ballot issues shall be decided in a state general election, biennial local district election, or on the first Tuesday in November of odd-numbered years.").

In 1993, the General Assembly passed legislation to clarify that under Amendment 1, measures pertaining only to tax, debt, and spending were eligible for placement on odd-year ballots. *See* § 1–41–102, 1 C.R.S. (1997). Tax, debt and spending measures could still be considered in general elections, that is, in even-numbered years, as well. However, non-tax or non-revenue measures could be considered only in general elections. *See* § 1–41–102, 1 C.R.S. (1997).

In the same year, the General Assembly also amended section 1–40–106(1) in order to provide consistency with the requirements of Amendment 1. For example, the previous legislation had mandated the Board to hold its first meeting upon the filing of a draft initiative submitted after a *general election. See* § 1–40–106(1), 1B C.R.S. (1992). The General Assembly amended the statute to provide that the Board's first meeting may

not be held until the first Wednesday in December after *an* election since elections may be held every year for tax, debt and spending initiatives. *See* Colo. Sess. Laws 1993, ch. 183, § 1–40–106(1) at 679.

In her comments before the House Committee in that year, Donetta Davidson, the Elections Officer speaking on behalf of the secretary of state, further addressed the odd-year and even-year time frames for different types of initiatives. To be consistent with the different time frames as they pertained to the Board's last meeting in May under section 1–40–106(1), Davidson suggested that the General Assembly replace the phrase "of the general election year" with the language "in the year in which the measure is to be voted on." *See Byrne,* 907 P.2d at 578 (Mullarkey, J., dissenting). The General Assembly's adoption of this suggested language leads us to conclude that the General Assembly approved of the Title Board scheduling meetings to consider initiatives depending on the nature of the proposed measure.

Since the 1993 amendments, the Title Board holds summer meetings to consider titles and summaries for proposed initiatives eligible for ballot placement the following year. To illustrate, for tax or revenue measures, the Title Board holds its last meeting no later than the third Wednesday in May in both even and odd-numbered years. This is because tax or revenue-raising measures may be placed on the ballot in any year, and thus such measures will be considered in that upcoming election. However, for non-tax and non-revenue measures, the Board follows a different procedure whereby the Board holds its last meeting no later than the third Wednesday in May in the year of the next general election, that is, the next even-numbered year.

Thus, the third Wednesday in May serves as the final deadline for initiatives seeking placement on the upcoming election ballot. If the Board has not set the titles and summary for a proposed measure before this date, the measure cannot be considered at the upcoming election.[3] However, the Board

---

3. The proponent of a proposed initiative controls to a great extent the timing and progress of the

initiative process by choosing the filing dates for submission to the secretary of state. In this

may continue to meet after the May deadline to consider proposed initiatives that cannot be considered at the upcoming November election.

## C.

■ Turning to the facts of our case, Howes contends that the statutory scheme governing the meetings of the Title Board does not provide the Title Board with jurisdiction to meet during the summer months to determine titles and summaries. Howes argues that the Board lacked authority to set the titles and summary on July 16, 1997, and then to amend them on August 6, 1997.

Under section 1–40–106(1), the Board's last meeting must be "no later than the third Wednesday in May in the year in which the measure [was] to be voted on." If the initiative was to be voted on in November 1997, then the Board may not meet after the third Wednesday in May 1997 to consider this measure and was without jurisdiction to set the titles and summary for this initiative in July and August 1997. If, however, the initiative was for the ballot in November 1998, then the Board may meet to consider this measure from the first Wednesday in December 1996 until the third Wednesday in May 1998,[4] and thus possessed jurisdiction to meet in July and August 1997. Therefore, the determinative question is whether this initiative could have been placed on the ballot for the 1997 election.

As our analysis below establishes, the answer to this question is the same regardless of whether the initiative is characterized as a non-revenue or revenue measure because this initiative could not have been considered by the voters at the November 1997 election. We first assume for analytic purposes that this initiative is a non-revenue measure. The secretary of state can only place non-revenue measures on the ballot during general elections, which occur in even-numbered years. Thus, if considered a non-revenue measure, this initiative was not eligible for voter consideration in the 1997 election and could not be considered until the 1998 election.

■ Assuming that the initiative is a revenue measure, the secretary of state could place the measure on the ballot in any year, including odd-numbered years such as 1997. However, in order for the initiative to be placed on the 1997 ballot, the proponent was required to submit a draft of the initiative at least twelve days prior to the Board's last meeting in May 1997, since any measures considered by the Board after its last meeting in May 1997 could not appear on the 1997 ballot.[5] The proponent in this case did not submit a draft of the initiative to the Board until July 3, 1997, after the Board was prohibited from considering measures for the 1997 election. Therefore, even if the initiative is a revenue measure, the initiative would still have appeared, at the earliest, on the ballot for the 1998 election.[6]

Because the Board met in the summer of 1997 and set the titles and summary for a measure eligible for placement, at the earliest, on the 1998 general election ballot, the Board complied with the section 1–40–106(1) mandate that its last meeting must be "no later than the third Wednesday in May in the year in which the measure [was] to be voted on." This statute does not prohibit the Title Board from meeting after the third Wednesday in May, but merely prohibits the Board

sense, the Board lacks significant discretion in determining when it will consider a particular measure.

4. Since there was an election in November 1997, the Board was prohibited from meeting for approximately a one-month period from the day of the election until the first Wednesday in December 1997. *See* § 1–40–106(1).

5. This prohibition does not include rehearings on determinations made by the Board during its last meeting in May, which must be held within forty-eight hours of that meeting. *See* § 1–40–107(1), 1 C.R.S. (1997); *Byrne,* 907 P.2d at 576.

6. We reaffirm that the sole authority to set an election date or place an initiative on a statewide ballot is vested in the secretary of state alone. *See Byrne,* 907 P.2d at 575. Further, the secretary of state does not exercise this authority while participating in the process of setting titles and summaries as a member of the Title Board. *See id.* Our decision in this case turns on the limitations contained within the statutory scheme which requires non-revenue measures to appear only on the ballots for general elections and which provides a deadline for proponents to submit draft initiatives to the Board.

from considering at such meetings measures to be placed on the ballot in the upcoming November election. Hence, we hold that the Board possessed the authority in this case to set the titles and summary on July 17, 1997, and to amend them on August 6, 1997, because this measure was eligible for placement on the ballot, at the earliest, in November 1998.

### III.

Additionally, Howes argues that the titles set by the Board are misleading because they fail to express correctly and fairly the true intent and meaning of the proposal.

Section 1–40–106(3)(b), 1 C.R.S. (1997), provides the Board with guidance in setting titles for proposed initiatives. This provision states:

> In setting a title, the title board shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a "yes" or "no" vote will be unclear. *The title for the proposed law or constitutional amendment, which shall correctly and fairly express the true intent and meaning thereof,* together with the ballot title, submission clause, and summary, shall be completed within two weeks after the first meeting of the title board. . . . Ballot titles shall be brief, shall not conflict with those selected for any petition previously filed for the same election, and shall be in the form of a question which may be answered "yes" (to vote in favor of the proposed law or constitutional amendment) or "no" (to vote against the proposed law or constitutional amendment) and which shall unambiguously state the principle of the provision sought to be added, amended, or repealed.

§ 1–40–106(3)(b), 1 C.R.S. (1997) (emphasis added).

▮▮▮ Our task in reviewing the titles and summaries set by the Board is narrowly circumscribed:

In reviewing the Board's title setting process, the law is settled that this court should not address the merits of the proposed initiative and should not interpret the meaning of proposed language or suggest how it will be applied if adopted by the electorate; we should resolve all legitimate presumptions in favor of the Board; and we will not interfere with the Board's choice of language if the language is not clearly misleading. Our duty is to ensure that the title, ballot title, submission clause, and summary fairly reflect the proposed initiative so that petition signers and voters will not be misled into support for or against a proposition by reason of the words employed by the Board.

*Workers Comp Initiative,* 850 P.2d at 146.

▮▮▮ Howes contends that the Board's titles are misleading because, while they accurately inform the voter that impact fees alone must finance the capital facilities required by new housing units, they fail to indicate that the impact fees for such facilities are to be determined by the school district involved. The Board asserts that given the structure of the two sentences that comprise the initiative, it "could fairly conclude that school districts may impose fair and adequate impact fees for operating costs, while other entities may be authorized to impose fees for capital improvements."

Because the initiative does not expressly address this issue, the process of determining the precise entities responsible for imposing school impact fees would necessarily involve the Board and us in the prohibited function of "address[ing] the merits of the proposed initiative and . . . interpret[ing] the meaning of proposed language or suggest[ing] how it will be applied if adopted by the electorate." *Id.* We therefore hold that the titles in this case are not misleading in violation of section 1–40–106(3)(b).

▮▮▮ Howes also argues that the phrase "school impact fees" contained in the titles and summary constitutes a prohibited "catch phrase," creating prejudice for the proposal in violation of section 1–40–106(3)(a).[7] "A

---

7. Section 1–40–106(3)(a), 1 C.R.S. (1997), provides in relevant part:

The summary shall be true and impartial and shall not be an argument, nor likely to create

'catch phrase' consists of 'words which could form the basis of a slogan for use by those who expect to carry out a campaign for or against an initiated constitutional amendment.'" *In re Proposed Initiative Designated "Governmental Business"*, 875 P.2d 871, 876 (Colo.1994) (quoting *In re Proposed Initiative on Casino Gaming*, 649 P.2d 303, 308 (Colo.1982)). The existence of a catch phrase or slogan is determined within the context of contemporary political debate. *See Workers Comp Initiative*, 850 P.2d at 147.

Howes does not provide any evidence that "school impact fees" constitutes a prohibited catch phrase beyond the assertion that such fees are commonly understood not to be a tax on the general population. This understanding does not create prejudice within the meaning of section 1–40–106(3)(a). *See In re Proposed Initiative "1996–6"*, 917 P.2d 1277, 1281 (Colo.1996) (holding that the phrase "public's interests in state waters" was not a prohibited catch phrase). We therefore conclude that the titles and summary set by the Board do not contain an impermissible catch phrase and do not create prejudice regarding the proposal.

### IV.

 Howes's last objection concerns the adequacy of the fiscal impact statement contained in the initiative summary.[8] Howes asserts that because the Board stated it did not consider the initiative's fiscal impact on school districts, its fiscal impact statement omits a key factor required by section 1–40–106(3)(a), 1 C.R.S. (1997). This section provides, in pertinent part:

> The title board may request assistance in the preparation of the summary from the legislative council and, *if, in the opinion of*

the title board, the proposed law or constitutional amendment will have a fiscal impact on the state or any of its political subdivisions,[9] shall request assistance in such matter from the office of state planning and budgeting or the department of local affairs. When the title board requests fiscal impact information from the office of state planning and budgeting or the department of local affairs, the fiscal impact information shall be filed with the secretary of state by 12 noon on the Friday before the meeting of the title board at which the draft is to be considered. The legislative council, the office of state planning and budgeting, and the department of local affairs shall furnish any assistance requested, *and the summary shall include an estimate of any such fiscal impact, together with an explanation thereof.*

§ 1–40–106(3)(a), 1 C.R.S. (1997) (emphasis added).

The original legislation did not require the Board to include a fiscal impact statement in its summary of a proposed initiative. This language was added to the statute in 1977 in the form of an amendment. The legislative history of this amendment reflects that one of its authors, Representative Forrest Burns, explained during proceedings before the House Judiciary Committee that initiative summaries should contain adequate data to allow the electorate to make informed decisions. *See* Second Reading of H.B. 1165 Before the House Judiciary Committee, 51st Gen. Assembly, 1st Reg. Sess. (1977). The authors of the amendment compared the proposed fiscal impact statement requirement to their own requirement of obtaining fiscal information for proposed legislation from the legislative council. *See id.*

---

prejudice, either for or against the measure.

8. The Board contends that Howes's motion for rehearing was insufficiently precise with respect to the allegation that the Board had the duty to request additional information from the office of state planning and the department of local affairs before setting the titles and summary. However, in situations where a petition for rehearing has been timely filed, we have exercised our original jurisdiction to address the merits of issues not raised in the petition for rehearing. *See In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming*, 873 P.2d 733, 738

n. 4 (Colo.1994); *In re Proposed Initiated Constitutional Amendment Concerning the "Fair Treatment of Injured Workers Amendment,"* 873 P.2d 718, 721 n. 3 (Colo.1994). Because Howes's petition for rehearing was timely filed, we therefore proceed to review the merits of his contentions.

9. "[S]chool districts and the boards which run them are considered to be political subdivisions of the state." *Bagby v. School Dist. No. 1*, 186 Colo. 428, 435, 528 P.2d 1299, 1302 (1974).

Here, the fiscal impact statement in the summary states as follows:

The fiscal impact of the proposed initiative on local governments *other than school districts* is indeterminate,[10] but it is not expected to materially affect such local government operations.

(Emphasis added.) According to the record, the Board requested the assistance of the office of state planning and budgeting and the department of local affairs in preparing the fiscal impact statement in accordance with the directive of section 1–40–106(3)(a). Both agencies submitted fiscal impact information to the Board, but failed to discuss the fiscal impact on school districts. Thus, the summary prepared by the Board does not include an estimate concerning the fiscal impact on school districts. The Board is to provide the electorate with adequate information to allow informed voting when state planning and budgeting or the department of local affairs can reasonably obtain the information.

Having reviewed the evidence and argument before the Board, we conclude that the fiscal impact information provided by the appropriate entities did not include estimates of the initiative's impact on school districts and thereby represented substantial omission from the fiscal statement the Board is required to make pursuant to section 1–40–106(3)(a). We thus remand to the Board to obtain reasonably available information from the office of state planning and budgeting and the department of local affairs, and we direct the Board to amend its summary to include such an assessment of the initiative's fiscal impact on school districts.

## V.

Accordingly, we hold that the Board had jurisdiction to set the titles and summary in the summer of 1997, and that the titles and summary fairly express the intent and meaning of the initiative. However, we hold that the Board's fiscal impact statement regarding the initiative is substantially inadequate. We therefore affirm the action of the Board in part, reverse in part, and remand this matter to the Board with directions to obtain and include in its summary the required fiscal impact information concerning school districts.

Chief Justice VOLLACK concurs in part and dissents in part.

*Appendix*

PROPOSED INITIATIVE "1997–98–# 26"

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING SCHOOL IMPACT FEES, AND IN CONNECTION THEREWITH, BARRING THE USE OF ANY STATE OR LOCAL PUBLIC FUNDS OTHER THAN IMPACT FEES ASSESSED ON NEWLY CONSTRUCTED HOUSING UNITS, TO CONSTRUCT, EXPAND, EQUIP, OR UPGRADE PUBLIC ELEMENTARY, MIDDLE, OR HIGH SCHOOLS NECESSITATED BY INCREASED STUDENT POPULATION FROM NEWLY CONSTRUCTED HOUSING UNITS; AND REQUIRING SCHOOL DISTRICTS TO DETERMINE FAIR AND ADEQUATE SCHOOL IMPACT FEES TO FINANCE ALL SALARIES AND BENEFITS FOR NECESSARY PERSONNEL FOR ONE YEAR TO ATTAIN OR MAINTAIN PROPER RATIOS OF ALL PERSONNEL NEEDED BY A SCHOOL DISTRICT BECAUSE OF INCREASED STUDENT POPULATION FROM NEWLY CONSTRUCTED HOUSING UNITS.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION

10. The "indeterminate" characterization of fiscal impact is permitted in certain situations. As we have explained:

While a separate explanation of the fiscal impact is preferred, a definitive fiscal impact statement is not required where, due to the variables or uncertainties inherent in the particular issue, the fiscal impact cannot reasonably be determined from the materials submitted to the Board.

*In re Proposed Initiated Constitutional Amendment Concerning Unsafe Workplace Environment*, 830 P.2d 1031, 1035 (Colo.1992) (citations omitted).

CONCERNING SCHOOL IMPACT FEES, AND IN CONNECTION THEREWITH, BARRING THE USE OF ANY STATE OR LOCAL PUBLIC FUNDS OTHER THAN IMPACT FEES ASSESSED ON NEWLY CONSTRUCTED HOUSING UNITS, TO CONSTRUCT, EXPAND, EQUIP, OR UPGRADE PUBLIC ELEMENTARY, MIDDLE, OR HIGH SCHOOLS NECESSITATED BY INCREASED STUDENT POPULATION FROM NEWLY CONSTRUCTED HOUSING UNITS; AND REQUIRING SCHOOL DISTRICTS TO DETERMINE FAIR AND ADEQUATE SCHOOL IMPACT FEES TO FINANCE ALL SALARIES AND BENEFITS FOR NECESSARY PERSONNEL FOR ONE YEAR TO ATTAIN OR MAINTAIN PROPER RATIOS OF ALL PERSONNEL NEEDED BY A SCHOOL DISTRICT BECAUSE OF INCREASED STUDENT POPULATION FROM NEWLY CONSTRUCTED HOUSING UNITS?

The summary prepared by the Board is as follows:

This measure prohibits the use of state or local government tax revenues, property taxes, or any other state or local public funds, except impact fees assessed on newly constructed housing units, to construct, expand, upgrade, or equip public elementary, middle, or high schools necessitated by increased student population from newly constructed housing units. The measure requires school districts to determine fair and adequate school impact fees that are sufficient to pay all salaries and benefits for necessary personnel for one year to attain or maintain proper ratios of all personnel needed by a school district because of increased student population from newly constructed housing units.

The fiscal impact of the proposed initiative on local governments other than school districts is indeterminate, but it is not expected to materially affect such local government operations.

State funding of the School Finance Act would increase at a slower rate insofar as the state would not fund its share of the act for one year for students living in newly constructed housing units. Due to a lack of data concerning the number of new students that will be attributed to new housing unit construction and the location of the school district in which the construction and consequent enrollment will occur, the amount of state fiscal impact is indeterminate.

In the year following the assessment of the school impact fees, the state would resume paying for the costs of education for pupils living in the housing units on which the school impact fee was assessed. The fiscal impact of this initiative on the state in years following the first assessment of school impact fees is indeterminate, since it depends on whether the number of students from newly constructed housing units is stable or increases.

8/6/97 Rehearing

Francis B. Howes, III motion denied with exception of partial rewording of title, ballot title and submission clause.

Adjourned 3:25 p.m.

Chief Justice VOLLACK concurring in part and dissenting in part:

In part II of its opinion, the majority holds that the title board did not violate section 1–40–106(1), 1 C.R.S. (1997), in scheduling a meeting after the third Wednesday in May of 1997. In part III of its opinion, the majority rejects the proponent's arguments that the title, submission clause, and summary of the proposed initiative are misleading and prejudicial. I concur with the majority on these issues.

In part IV of its opinion, the majority concludes that the summary erroneously omits information regarding the fiscal impact of the proposed measure on school districts. Consequently, the majority remands to the title board with directions to request more information from the office of state planning and budgeting or the department of local affairs (the state agencies). In my view, the summary adequately discusses the fiscal impact the proposed measure would have on the state and its political subdivisions pursuant to section 1–40–106(3)(a), 1 C.R.S. (1997). Accordingly, I dissent to part IV of the majority's opinion.

## I.

Section 1–40–106(3)(a) provides in pertinent part as follows:

> The title board shall prepare a clear, concise summary of the proposed law or constitutional amendment.... The title board may request assistance in the preparation of the summary from the legislative council and, *if, in the opinion of the title board, the proposed law or constitutional amendment will have a fiscal impact on the state or any of its political subdivisions, shall request assistance in such matter from the office of state planning and budgeting or the department of local affairs.* ... The legislative council, the office of state planning and budgeting, and the department of local affairs shall furnish any assistance requested, and *the summary shall include an estimate of any such fiscal impact, together with an explanation thereof.*

(Emphasis added.)

In this case, the summary describes the fiscal impact of the proposed measure on the state and its political subdivisions as follows:

> The fiscal impact of the proposed initiative on local governments other than school districts is indeterminate, but it is not expected to materially affect such local government operations.
>
> State funding of the School Finance Act would increase at a slower rate insofar as the state would not fund its share of the act for one year for students living in newly constructed housing units. Due to a lack of data concerning the number of new students that will be attributed to new housing unit construction and the location of the school district in which the construction and consequent enrollment will occur, the amount of state fiscal impact is indeterminate.
>
> In the year following the assessment of the school impact fees, the state would resume paying for the costs of education for pupils living in the housing units on which the school impact fee was assessed. The fiscal impact of this initiative on the state in years following the first assessment of school impact fees is indeterminate, since it depends on whether the number of students from newly constructed housing units is stable or increases.

The majority holds that the omission of a discussion concerning the proposed measure's fiscal impact on school districts was error and remands to the title board to request additional information from the state agencies. In my view, remanding for additional information is unnecessary because the summary repeatedly describes the proposed measure's fiscal impact on the state and its political subdivisions as "indeterminate."

The proposed measure provides that impact fees shall pay for new capital improvements in schools "necessitated by increased student population from newly constructed housing units." Additionally, the proposed measure requires that impact fees finance one year of salaries and benefits for added personnel. Currently, state funding to meet the needs of increased school enrollment comes to school districts through operation of the School Finance Act, §§ 22–54–101 to –21, 7 C.R.S. (1997).

The proposed measure's applicability is dependent on future growth and home building within the school districts of this state. While some school districts may grow at alarming rates, others may experience declining or stagnant growth that never implicates the proposed measure. It is therefore impossible to accurately quantify the proposed measure's statewide fiscal impact. For this reason, the summary repeatedly explains that the fiscal impact of the proposed measure is indeterminate.

The summary expressly excludes school districts from its explanation of fiscal impact because the title board did not receive fiscal impact data on school districts from either the state agencies or the proponent.[11] However, it can be easily inferred from the summary that the fiscal impact on school districts would also be indeterminate. This is especially apparent from the fiscal impact discussion regarding state funding under the

---

11. In fact, the proponent argued before the title board that the summary should omit any reference to fiscal impact because this information was not "applicable or informative."

School Finance Act. The summary explains that state fiscal impact under the School Finance Act is indeterminate due to a lack of adequate data concerning the number of students living in newly constructed housing and the different school districts involved. It therefore follows that the potential fiscal impact on school districts, which receive funding under the School Finance Act, must also be indeterminate.

## II.

In my view, remanding this question to the title board will not lead to the inclusion of any meaningful information in the summary. Following the request for information and the submission of the state agencies' reports, the summary will most likely include a statement that the fiscal impact on school districts is indeterminate. In my view, the value of including this information in the summary is clearly outweighed by the time and expense involved in obtaining it. Accordingly, I dissent to part IV of the majority's opinion.