In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR 1997-98 #30

John S. OUTCELT, Petitioner,

v.

Douglas BRUCE and Jeffrey Wright, Respondents,

and

Rebecca Lennahan and Richard Westfall, Title Board.

No. 97SA319.

Supreme Court of Colorado, En Banc.

March 16, 1998.

As Modified on Denial of Rehearing April 13, 1998.

Susan E. Burch, Denver, for Petitioner.

Gale A. Norton, Attorney General, Martha Phillips·Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver,·for Title Board.

Douglas Bruce, pro se., Colorado Springs.

Justice HOBBS delivered the Opinion of the Court.

Petitioner, John S. Outcelt (Outcelt), brought this original proceeding under section 1–40–107(2), 1 C.R.S. (1997), to review the August 20, 1997, action of the Title Board (Board), in fixing a title, ballot title and submission clause, and summary (titles and summary) for a ballot initiative (Initiative # 30) for the 1998 general election. Outcelt contends that the Board lacked jurisdiction to act after the third Wednesday in May. Outcelt also argues that Initiative # 30 addresses multiple subjects, that the titles and summary do not fairly or accurately describe the subject matter, and that the fiscal impact statement is insufficient. We hold that the title Board had jurisdiction to act on Initiative # 30 in August of 1997. However, the proposed initiative contains more than one subject in violation of the Colorado Constitution, and the Board should have refused to fix the titles and summary. Accordingly, we reverse the title Board's action.

## I.

Initiative # 30 would add a new paragraph (d) to subsection (8) of section 20 of article X of the Colorado Constitution, generally known as Amendment 1. Subsection (8) of Amendment 1 is entitled "Revenue limits." The new paragraph would read as follows:

(8)(d) A $25 tax cut, increased $25 the next year and then $50 yearly (to $100, $150 . . .), shall lower each tax bill for each 1999 and later district: utility customer tax and franchise charge; · vehicle ownership tax; yearly income tax; property tax spent on human and health services, district attorney and assessor offices, libraries, courts, schools, economic development, enterprises, and authorities combined; property tax equal to yearly payments for lease-purchases and school debt; remaining business personal property tax; property tax equal to yearly·tax amounts from property or other tax rates that are increased after November 3, 1992, except for fixed maximum tax rates with a fixed maximum number of dollars that are voter-approved since 1992, stated in the ballot title, and subject to increase by later voter approval only; and property tax equal to yearly amounts from exceeding either local spending limit percentage, computed since 1992, except for a fixed maximum number of dollars as described above. The state shall replace affected local revenue monthly within all tax and spending limits, and audit each limit yearly; legal fees and costs shall mandatorily be awarded to successful plaintiffs only; and once a year, the general assembly may delay for one year all or part of the next year's increase in one or more tax cuts, but only if further tax cut or replacement amounts in that next year will leave total remaining state revenue from all sources growing less than $200 million.[1]

Thus, Initiative # 30 proposes to effectuate an annually increasing reduction in tax revenue which municipalities, school districts, and various special districts depend upon to fund local programs. Revenues affected include those from utility customer and franchise charges, vehicle ownership taxes, and property taxes that fund human and health services, district attorney and assessors offices, libraries, courts, schools, economic development, enterprises, and authorities. The shortfall in local programs caused.by the tax cuts would be funded by the transfer of state revenues to local governments.

1. The titles and summary are attached to this opinion as Appendix A.

Under a separate provision, Initiative # 30 proposes to add new criteria to Amendment 1 providing that voter-approved revenue and spending increases enacted since 1992 are to specify a maximum tax rate with a fixed maximum number of dollars in the ballot title of those measures. The initiative also addresses annual compliance audits which must be funded by the state, and payment of costs and legal fees to successful plaintiffs.

The secretary of state's office received proposed Initiative # 30 on August 1, 1997. The Board met and fixed the titles and summary on August 20, 1997. On September 3, 1997, upon request by Outcelt, the Board held a rehearing, as required by statute. On rehearing, the Board partially reworded the title, ballot title and submission clause. Outcelt then sought review in this court.

## II.

We hold that the Board had jurisdiction to meet and take action on Initiative # 30 in August of 1997. However, because the initiative contains more than one subject in violation of the Colorado Constitution, the Board should have refused to set the titles and summary.

### A.

#### Jurisdiction of the Title Board

In *In re Proposed Initiative # 26 Concerning School Impact Fees,* 954 P.2d 586, 591 (Colo.1998), we held that the Board has jurisdiction under section 1–40–106(1), 1 C.R.S. (1997), to meet between June and a November election to act on proposed initiatives which will not be considered for the ballot in that same year.

That statutory provision contains two bars, neither of which is applicable here. The first bar of section 1–40–106(1) prevents the Board from meeting between a November election and the first Wednesday in December: "The first meeting of the title Board shall be held no sooner than the first Wednesday in December after an election." With regard to a measure which could qualify for that same year's ballot, the second bar provides that the Board cannot meet, except for rehearing petitions heard within forty-eight hours, after "the third Wednesday in May *in the year in which the measure is to be voted on.*" § 1–40–106(1), 1 C.R.S. (1997) (emphasis added).

Although tax, debt, and spending measures are eligible for placement on odd or even year ballots, *see School Impact Fees,* 954 P.2d at 590, there is no contention and no possibility in the case before us that Initiative # 30 could have qualified for the November 1997 election. The secretary of state's office received Initiative # 30 on August 1, 1997. To be considered by the Board at one of its regularly scheduled meetings, a proposed initiative must be submitted no less than twelve days prior to that meeting. *See* § 1–40–106(1). Accordingly, the Board met on August 20, 1997, that being the third Wednesday of August and the first regular meeting after the required twelve days had passed.

The requisite number of signatures for a valid petition requesting placement of an initiative on the ballot must be filed with the secretary of state at least three months prior to the election in which the initiative is to be voted on. *See* Colo. Const. art. V, § 1(2); *School Impact Fees,* 954 P.2d at 589. To place Initiative # 30 on the 1997 ballot, the needed signatures would have had to be filed with the secretary of state in the first week of August. Since the Board's title setting action did not occur until the third week in August, Initiative # 30 could not have qualified for the November 1997 election. The first election for which this initiative could be eligible is the 1998 general election. Consequently, under the statute, the Board could meet to consider Initiative # 30 before the third Wednesday in May of 1998, including during the summer of 1997, except that it could not have met between the November 1997 election and the first Wednesday in December of 1997.

Thus, we hold that the Board complied with the provisions of section 1–40–106(1) and had jurisdiction to meet and act on Initiative # 30 in August of 1997. *See School Impact Fees,* 954 P.2d at 590–591.

## B.

### Multiple Subjects

■ Outcelt's next contention is that Initiative # 30 contains multiple subjects in violation of the Colorado Constitution. We agree. The constitution prohibits initiatives containing more than one subject such that a title cannot be fixed to clearly express the single subject:

No measure shall be proposed by petition containing more than one subject which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. *If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.*

Colo. Const. art. V, § 1(5.5) (emphasis added); *see also* § 1–40–106.5, 1 C.R.S. (1997). While we may not address the merits of a proposed initiative or suggest how an initiative might be applied if enacted, *see School Impact Fees,* 954 P.2d at 592, we must sufficiently examine an initiative to determine whether or not the constitutional prohibition against initiative proposals containing multiple subjects has been violated.[2] In construing an initiative for this limited purpose, we employ the usual rules of statutory construction. *See* § 2–4–101, 1 C.R.S. (1997) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."); *Bickel v. City of Boulder,* 885 P.2d 215, 228 n. 10 (Colo.1994) (general rules of statutory

construction apply to interpretation of citizen-initiated measures).

■ One concern which led to voter enactment in 1994 of the multiple subject ban is that proponents would combine different proposals in the hopes of getting unrelated subjects passed by enlisting support for the entire initiative from advocates of the separate subjects—"thereby securing the enactment of subjects that could not be enacted on their merits alone." *In re Parental Choice in Education,* 917 P.2d 292, 294 (Colo.1996); *see also In re Proposed Initiative "Public Rights in Waters II",* 898 P.2d 1076, 1079 (Colo.1995) ("the single subject requirement precludes the joining together of multiple subjects into a single initiative in the hope of attracting support from various factions"). Another purpose of this prohibition on multiple subjects is to "protect the voters from fraud and surprise." *In re Parental Choice in Education,* 917 P.2d at 294.

An initiative impermissibly contains more than one subject if "its text relates to more than one subject and if the measure has at least two distinct and separate purposes which are not dependent upon or connected with each other." *In re Proposed Petition,* 907 P.2d 586, 590 (Colo.1995). The risk of "uninformed voting caused by items concealed within a lengthy or complex proposal" is what the single subject requirement seeks to avoid. *Public Rights in Waters II,* 898 P.2d at 1079.

In *Public Rights in Waters II,* the fact that all the provisions of a proposed initiative involved "water" was not sufficient to meet the single subject requirement. That initiative would have (1) mandated the adoption and defense of a "strong public trust doctrine" regarding Colorado waters, and (2) set new election and boundary requirements for water conservancy and conservation districts. We concluded that these two provisions were "separate and discrete" and had

2. We must exercise caution to avoid determining how a measure, not yet approved by the voters, may apply. It is neither appropriate nor possible for the court to attempt to predict all of the effects of an amendment at the pre-election stage. Our ordinary method involves a case-by-case decision making process focusing on a record and the application of law to the operative facts. Here, because we are assigned the duty of ascertaining whether a proposed initiative contains more than a single subject in violation of the constitution, our decision must at least identify and characterize the proposals which proponents wish to place before the electorate. We must engage in some substantive inquiry but avoid predicting legal consequences.

"no unifying or common objective" although both topics related to Colorado water. *Public Rights in Waters II*, 898 P.2d at 1080.[3] Similarly, in *Amend Tabor 25*, 900 P.2d 121, 125 (Colo.1995), we determined that the common characteristic "revenue" did not create a necessary or proper connection between the establishment of specific tax credits and procedures for future ballot title initiative measures.

Here, the Board contends that the proposal has a single subject: "tax cuts." The proponents of Initiative # 30 argue that the single subject is "a $25 tax cut." We disagree. Although a tax cut is one of the purposes of this initiative, the initiative also proposes to subject voter-approved local revenue and spending increases enacted since 1992 to a new Amendment 1 requirement—that a fixed tax rate/maximum dollar amount must be stated in the ballot title of those measures.

To place Initiative # 30 in context, it is necessary to briefly review Amendment 1 which Initiative # 30 would amend. Amendment 1, enacted by the voters in 1992, places revenue limitations, *see* Colo. Const. art. X, § 20(4) & (8), and spending limitations, *see* Colo. Const. art. X, § 20(7), on state and local governments. *See Havens v. Board of County Comm'rs*, 924 P.2d 517, 520 (Colo. 1996). These provisions operate separately and independently. The first is a limitation on receipt of revenue by governmental entities, described in Amendment 1 as districts, while the second is a limitation on district spending of lawfully derived revenues. Revenues in excess of the spending cap must be refunded "unless voters approve a revenue change as an offset." Colo. Const. art. X, § 20(7)(d). In *Amend Tabor 25*, 900 P.2d at 126, we observed that the Legislative Council cited Amendment 1 as an example of a multiple subject measure the enactment of which

led to the proposal and adoption of the single subject matter constitutional provision in 1994. *See also In re Proposed Initiative 1996–4*, 916 P.2d 528, 533 (Colo.1996) (holding that an initiative proposing to repeal Amendment 1 necessarily involved multiple subjects).

We find at least two subject matters in Initiative # 30. In addition to a tax cut, Initiative # 30 impacts previous voter-approved revenue and spending increases.

### 1. Tax Cuts

It is clear from the language of Initiative # 30 that one purpose of the proposal is to apply "a $25 tax cut, increased $25 the next year and then $50 yearly (to $100, $150 . . .)" to the taxes described in the initiative. This, according to the proponents and the Board, is the single and primary subject matter of Initiative # 30. Although this is the most apparent subject, at least one other unrelated subject exists in the language of this proposal.

### 2. New Criteria for Voter-Approved Revenue and Spending Increases

In addition to creating a tax cut, the initiative proposes to add new criteria to subsection (8) of Amendment 1 applicable to revenue and spending increases approved by the voters since 1992. These criteria are that the ballot title of those measures must be specific in setting forth "fixed maximum tax rates with a fixed maximum number of dollars."

Amendment 1, as enacted by the voters in 1992, does not require such specificity in the tax rate or the number of dollars involved in order for the voters to exempt increases from Amendment 1's revenue and spending limits. *See Bickel v. City of Boulder*, 885

---

**3.** In *Public Rights in Waters II* we noted that part of the distinction between the two provisions of the initiative was that one assigned an overall duty to state government over which the affected local entities had little or no power:

> No necessary connection exists between the two district election requirements paragraphs and the two public trust water rights paragraphs. The public trust water rights paragraphs of the Initiative impose obligations on

the state of Colorado to recognize and protect public ownership of water. The water conservancy or conservation districts have little or no power over the administration of the public water rights or the development of a statewide public trust doctrine because such rights must be administered and defended by the state and not by the local district.

*Public Rights in Waters II*, 898 P.2d at 1080.

P.2d 215, 233–34 (Colo.1994) (initiative seeking tax increase where rate was "without limitation" complied with Amendment 1's requirements; voter approval of "each individual increase in the tax rate" is not necessary under Amendment 1). According to the comments which the Office of State Planning and Budgeting filed with the Board pursuant to section 1–40–106(3)(a), 1 C.R.S. (1997), 244 election outcomes that approved increases of $1,265,308,790 are potentially affected by Initiative # 30.[4]

Although we cannot reach the merits of Initiative # 30 at this stage, our examination for compliance with the single-subject requirement reveals, in addition to a tax cut, new requirements for Amendment 1 revenue and spending increases approved by the voters since 1992. As we pointed out in *Havens v. Board of County Comm'rs*, 924 P.2d 517, 522 (Colo.1996), voter approval of tax increases and governmental retention and spending of revenues which might otherwise be subject to refund under Amendment 1, is a prerogative of the electorate. At the time voters approved Amendment 1, there was an expectation that the provisions of that initiative would "defer to citizen approval or disapproval [of] certain proposed tax, revenue, and spending measures that varied from Amendment 1 limitations." *Id.*

Under the applicable precedent, we also examine Initiative # 30 to ascertain whether the multiple subject matters are combined in a manner that could result in voter surprise or fraud. *See In re Parental Choice on Education*, 917 P.2d at 294. The language regarding voter-Approved revenue and spending increases is buried within the tax cut language. When considering Initiative # 30, voters could be enticed to vote for the measure in order to enact the tax cut while not realizing that passage of the measure would simultaneously achieve a purpose not necessarily related to a tax cut.

Because the initiative contains two subject matters, a tax cut and new criteria for voter approval of revenue and spending increases under Amendment 1, the Board should not have fixed the titles and summary.

## C.

### Other Issues

Outcelt argues that Initiative # 30 contains the third subject of a state revenue shift to fund local programs, causing a reduction in state programs because the initiative proposes to count the state replacement of local revenues as fiscal year spending for purposes of the state's Amendment 1 spending cap. This could foreclose the state from availing itself of the "collections for another government" exception from state fiscal year spending provided by Colo. Const. art. X, § 20(2)(e).

Outcelt also contends that, even if the initiative contains only one subject, the titles and summary are not accurate or fair in that the principal subject of the initiative is not accurately described, the term "tax cut" constitutes a catch phrase, and the fiscal impact statement does not reflect information received by the Board.

Because we conclude that the initiative contains more than one subject in violation of the Colorado Constitution, we do not address these additional contentions.

4. The Department of Local Affairs made the following statements in its comments to the Board:

> The practical effect of this provision may be to eviscerate hundreds of voter-approved revenue changes which have occurred at the local level since 1992. Under current law, local governments have been repeatedly authorized by their voters to exceed [Amendment 1's] spending limits with monies derived from both new and existing revenue sources, some of which are taxes. This additional spending authority is often not limited by the provisions of [Amendment 1].
> Under this provision, local governments may be forced to curtail certain revenues and ex-

> penditures that have directly resulted from such voter-approved measures. State replacement of the revenue lost by means of the measure's "tax cuts" might not be forthcoming because the replacement revenue would not be "within all tax and spending limits."
>
> . . .
>
> If one of those [elections], for example, allowed a town to keep and spend an additional $50,000, then the measure might require the town to reduce property taxes by $50,000. It is possible that no state replacement of this revenue would be forthcoming because the $50,000 would be outside of the town's spending limit.

### III.

Accordingly, the Board had jurisdiction to act on Initiative # 30 in August of 1997; but the proposed initiative contains more than one subject matter such that the Board should not have fixed a title. We reverse the Board's action and return this matter to the Board with directions to strike the titles and summary and return Initiative # 30 to its proponents.

### APPENDIX A

**Proposed Initiative 1997–98—# 30**

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING THE ESTABLISHMENT OF A TWENTY–FIVE DOLLAR TAX CUT TO LOWER EACH TAX BILL FOR EACH 1999 STATE AND LOCAL GOVERNMENT: UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, YEARLY INCOME TAX, AND SPECIFIED PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT BY TWENTY–FIVE DOLLARS THE NEXT YEAR AND FIFTY DOLLARS YEARLY THEREAFTER; REQUIRING MONTHLY STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WITHIN TAX AND SPENDING LIMITS AND YEARLY STATE AUDITS OF SUCH LIMITS; AWARDING MANDATORY LEGAL FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY; AND ALLOWING A DELAY IN YEARLY INCREASES IN ONE OR MORE TAX CUTS IF REMAINING YEARLY STATE REVENUE FROM ALL SOURCES WILL GROW LESS THAN TWO HUNDRED MILLION DOLLARS.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION CONCERNING THE ESTABLISHMENT OF A TWENTY–FIVE DOLLAR TAX CUT TO LOWER EACH TAX BILL FOR EACH 1999 STATE AND LOCAL GOVERN- MENT: UTILITY CUSTOMER TAX AND FRANCHISE CHARGE, VEHICLE OWNERSHIP TAX, YEARLY INCOME TAX, AND SPECIFIED PROPERTY TAX, AND, IN CONNECTION THEREWITH, INCREASING THE TAX CUT BY TWENTY– FIVE DOLLARS THE NEXT YEAR AND FIFTY DOLLARS YEARLY THEREAFTER; REQUIRING MONTHLY STATE REPLACEMENT OF AFFECTED LOCAL REVENUE WITHIN TAX AND SPENDING LIMITS AND YEARLY STATE AUDITS OF SUCH LIMITS; AWARDING MANDATORY LEGAL FEES AND COSTS TO SUCCESSFUL PLAINTIFFS ONLY; AND ALLOWING A DELAY IN YEARLY INCREASES IN ONE OR MORE TAX CUTS IF REMAINING YEARLY STATE REVENUE FROM ALL SOURCES WILL GROW LESS THAN TWO HUNDRED MILLION DOLLARS?

The summary prepared by the Board is as follows:

This measure amends article X, section 20 of the Colorado Constitution, by adding a new paragraph (d) to subsection (8). A twenty-five dollar tax cut, increased by twenty-five dollars the next year and fifty dollars each year thereafter, would lower each tax bill for each state and local government: utility customer tax and franchise charge; vehicle ownership tax; yearly income tax; property tax spent on human and health services, district attorney and assessor offices, libraries, courts, schools, economic development, enterprises, and authorities combined; property tax equal to annual payments for lease-purchases and school debt; remaining business personal property tax; property tax equal to yearly amounts from tax rates increased after November 3, 1992, unless voter-approved since 1992, stated in the ballot title as a fixed maximum tax rate with a fixed maximum number of dollars, and subject to increase by later voter approval only; and property tax equal to yearly amounts exceeding either local spending limit percentage computed since 1992, unless voter-approved since 1992, stated in the ballot title as a fixed maximum number of dollars, and subject to increase by later voter approval only. The

initial tax cut of twenty-five dollars is applied to tax bills for tax year 1999.

The state is required to replace monthly the local government revenue affected by the tax cuts established by this measure, within all tax and spending limits, and to audit each limit yearly. Legal fees and costs are awarded mandatorily to successful plaintiffs only who seek to enforce this new measure. *Once a year, the general assembly may delay for one year all or a portion of the next year's increase in the tax cut for one or more taxes specified in this measure if further increase in the tax cuts or replacement revenues will result in total remaining state revenue in that next year from all sources growing less than $200 million.*

*State impacts.* The state income tax cut would reduce the growth in state general fund revenue by $157,027,985 during the three-year period beginning with fiscal year 1998–99. The cut in the state utility customer tax would reduce the growth in state general fund revenue by an indeterminate amount during the same three-year period.

The cost to the state of replacing local government revenue losses during the three-year period beginning with fiscal year 1998–99 would be as follows:

- Vehicle ownership taxes—$282,202,345
- Property tax for specific services—at least $455,250,000
- Business personal property tax—$42,-750,000

The state would also incur costs to replace local government revenue losses for utility customer taxes, franchise taxes, and property taxes, but the amount of these additional costs is indeterminate. The state would incur costs of at least $1,000,000 to administer the tax cuts allowed by this measure. In addition, the state may incur costs for possible annual audits, but the amount of these additional costs is indeterminate.

The combined effect of the revenue reductions and the increased expenditure requirements is a net negative state fiscal impact of at least $938,307,875 during the three-year period beginning with fiscal year 1998–99. The figure does not include the amount of negative fiscal impact that will occur but is indeterminate at this time.

The fiscal impact to the state described above assumes no impact by the $200,000,000 minimum increase in all state revenue contained in the measure.

*Local impacts.* This measure may have a negative fiscal impact on some local governments, since the state would be obligated to replace local revenue losses only up to local tax and spending limits and revenues are currently being collected outside those limits as authorized by local votes. This measure may increase local government costs due to possible audit costs, legal fees and costs that must be mandatorily awarded, and possible increased litigation. The amount of these additional local costs is indeterminate.

9/3/97 Rehearing

- John S. Outcelt Motion denied with exception of partial rewording of title, ballot title and submission clause
- Douglas Bruce Motion denied with exception of partial rewording of title, ballot title and submission clause

Adjourned 2:57 p.m.