In the MATTER OF the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR 1997–98 No. 113 (COMMERCIAL SWINE FEED OPERATIONS):

David AMUNDSON, Brad Anderson, and Brett Rutledge, Petitioners,

v.

Galen TRAVIS and James R. Paxson, Respondents,

and

Victoria Buckley, Rebecca Lennahan, and Richard Westfall, Title Setting Board.

No. 98SA234.

Supreme Court of Colorado, En Banc.

July 6, 1998.

Treece, Alfrey, Musat & Bosworth, P.C., Robert S. Treece, Michael L. Hutchinson, Denver, Jean E. Dubofsky, Jean E. Dubofsky, Boulder, for Petitioners.

Brownstein, Hyatt, Farber & Strickland, P.C., Wayne F. Forman, Denver, Isaacson, Rosenbaum, Levy & Woods, P.C., Mark G. Grueskin, Denver, for Respondents.

Gale A. Norton, Attorney General, Martha Phillips, Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, Maurice G. Knaizer, Deputy Attorney General, State Services Section Denver, for Title Board.

PER CURIAM.

Petitioners David Amundson, Brad Anderson, and Brett Rutledge, three registered voters, challenge the actions of the Title Board in setting the title, ballot title, and submission clause for Initiative No. 113, a proposal that would impose additional environmental regulations on certain swine feeding operations. The text of the Initiative, as well as the titles and summary, are set forth in an appendix to this opinion.

Petitioners argue that: (1) a meeting between proponents of Initiative No. 113—who are named as respondents in this action—and General Assembly staff members was held less than 24 hours after notice of the meeting was publicly posted, in violation of the "full

and timely notice" requirement for such meetings imposed by Article V, section 1(5) of the Colorado Constitution; (2) the proposed initiative contained more than one subject in violation of Article V, section 1(5.5); and (3) the title, ballot title and submission clause, and summary approved by the Title Board failed to correctly and fairly reflect the intent and meaning of the proposed initiative as required by section 1–40–106(3)(a), 1 C.R.S. (1997).

Petitioners acknowledge that they had actual notice of the meeting before it occurred, and they have failed to articulate how they were cognizably prejudiced by the short time between the public posting and the time when the meeting was held. As for the single-subject argument, the fact that an initiative may be intended to achieve more than one beneficial *effect*, i.e., the reduction of both air and water pollution, does not mean it embraces more than one *subject*, i.e., regulation of swine operations. We reject the petitioners' arguments and affirm the actions of the Title Board without opinion. See C.A.R. 35(e); *In re Initiative for 1997–1998 # 77 Concerning Political Contributions*, 960 P.2d 129 (Colo.1998); *In re Initiative Pertaining to Proposed Constitutional Amendment Entitled "W.A.T.E.R. II"*, 831 P.2d 490, 491 (Colo.1992).

KOURLIS and HOBBS, JJ., do not participate.

### APPENDIX

### PROPOSED INITIATIVE
#### "1997—98 # 113" [1]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO REVISED STATUTES CONCERNING REGULATION OF HOUSED COMMERCIAL SWINE FEEDING OPERATIONS WHICH CAN HOUSE 800,000 OR MORE POUNDS OF SWINE OR WHICH ARE DEEMED COMMERCIAL UNDER LOCAL LAW, AND, IN CONNECTION THEREWITH, CONDITIONING OPERATION, CONSTRUCTION, OR EXPANSION OF A HOUSED COMMERCIAL SWINE FEEDING OPERATION ON RECEIPT OF AN INDIVIDUAL DISCHARGE PERMIT FROM THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT; DIRECTING THE WATER QUALITY CONTROL COMMISSION TO ADOPT RULES REGARDING THE CONSTRUCTION, OPERATION, AND MANAGEMENT OF AND WASTE DISPOSAL BY SUCH OPERATIONS; PROVIDING THAT SUCH RULES REQUIRE THAT LAND APPLICATION OF WASTE FROM SUCH OPERATIONS SHALL NOT EXCEED THE NUTRITIONAL REQUIREMENTS OF THE PLANTS ON THAT LAND AND SHALL MINIMIZE RUN OFF AND SEEPAGE OF SUCH WASTE; PROVIDING THAT SUCH RULES REQUIRE THAT SUCH OPERATIONS NOT BE PERMITTED TO DEGRADE THE PHYSICAL ATTRIBUTES OR VALUE OF STATE TRUST LANDS, MAKE IMMEDIATE REPORTS OF SPILLS OR CONTAMINATION TO STATE AND COUNTY HEALTH DEPARTMENTS, AND MONITOR LAND–APPLIED WASTE FROM SUCH OPERATIONS AND REPORT THEREON TO THE STATE HEALTH DEPARTMENT; AUTHORIZING FEES ON SUCH OPERATIONS TO OFFSET DIRECT AND INDIRECT COSTS OF THE PROGRAM; AUTHORIZING LOCAL GOVERNMENTS TO IMPOSE MORE RESTRICTIVE REQUIREMENTS; REQUIRING THAT SUCH OPERATIONS EMPLOY TECHNOLOGY TO MINIMIZE ODOR EMISSIONS; REQUIRING OPERATIONS TO COVER WASTE IMPOUNDMENTS THAT DO NOT USE AIR OR OXYGEN IN THEIR WASTE TREATMENT METHOD, AND TO RECOVER, INCINERATE, OR MANAGE ODOROUS GASES THEREFROM; ESTABLISHING MINIMUM DISTANCES BETWEEN NEW LAND WASTE APPLICATION SITES OR IMPOUNDMENTS AND OCCUPIED DWELLINGS, SCHOOLS, AND MUNICIPAL BOUNDARIES; AND PROVIDING FOR ENFORCEMENT OF THESE PRO-

---

**1.** Commercial Swine Feeding Operations

VISIONS BY THE STATE OR ANY PERSON WHO MAY BE ADVERSELY AFFECTED.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO REVISED STATUTES CONCERNING REGULATION OF HOUSED COMMERCIAL SWINE FEEDING OPERATIONS WHICH CAN HOUSE 800,000 OR MORE POUNDS OF SWINE OR WHICH ARE DEEMED COMMERCIAL UNDER LOCAL LAW, AND, IN CONNECTION THEREWITH, CONDITIONING OPERATION, CONSTRUCTION, OR EXPANSION OF A HOUSED COMMERCIAL SWINE FEEDING OPERATION ON RECEIPT OF AN INDIVIDUAL DISCHARGE PERMIT FROM THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT; DIRECTING THE WATER QUALITY CONTROL COMMISSION TO ADOPT RULES REGARDING THE CONSTRUCTION, OPERATION, AND MANAGEMENT OF AND WASTE DISPOSAL BY SUCH OPERATIONS; PROVIDING THAT SUCH RULES REQUIRE THAT LAND APPLICATION OF WASTE FROM SUCH OPERATIONS SHALL NOT EXCEED THE NUTRITIONAL REQUIREMENTS OF THE PLANTS ON THAT LAND AND SHALL MINIMIZE RUN OFF AND SEEPAGE OF SUCH WASTE; PROVIDING THAT SUCH RULES REQUIRE THAT SUCH OPERATIONS NOT BE PERMITTED TO DEGRADE THE PHYSICAL ATTRIBUTES OR VALUE OF STATE TRUST LANDS, MAKE IMMEDIATE REPORTS OF SPILLS OR CONTAMINATION TO STATE AND COUNTY HEALTH DEPARTMENTS, AND MONITOR LAND–APPLIED WASTE FROM SUCH OPERATIONS AND REPORT THEREON TO THE STATE HEALTH DEPARTMENT; AUTHORIZING FEES ON SUCH OPERATIONS TO OFFSET DIRECT AND INDIRECT COSTS OF THE PROGRAM; AUTHORIZING LOCAL GOVERNMENTS TO IMPOSE MORE RESTRICTIVE REQUIREMENTS; REQUIRING THAT SUCH OPERATIONS EMPLOY TECHNOLOGY TO MINIMIZE ODOR EMISSIONS; REQUIRING OPERATIONS TO COVER WASTE IMPOUNDMENTS THAT DO NOT USE AIR OR OXYGEN IN THEIR WASTE TREATMENT METHOD, AND TO RECOVER, INCINERATE, OR MANAGE ODOROUS GASES THEREFROM; ESTABLISHING MINIMUM DISTANCES BETWEEN NEW LAND WASTE APPLICATION SITES OR IMPOUNDMENTS AND OCCUPIED DWELLINGS, SCHOOLS, AND MUNICIPAL BOUNDARIES; AND PROVIDING FOR ENFORCEMENT OF THESE PROVISIONS BY THE STATE OR ANY PERSON WHO MAY BE ADVERSELY AFFECTED?

The summary prepared by the Board is as follows:

This measure enacts new statutory provisions regulating "housed commercial swine feeding operations," generally known as hog farms. It would put the Colorado department of public health and environment ("department") in charge of issuing permits and supervising the operation of hog farms, to the extent that such operations affect air and water quality, under a program financed by the assessment of annual permit fees of up to 20 cents per animal.

Housed commercial swine feeding operation is defined as an operation: that can house, alone or with another jointly owned or managed operation, 800,000 or more pounds of swine; or that is deemed commercial under local law.

The areas in which the department would write new regulations and enforce the requirements of the measure include the following:

—Issuance of initial permits, including site requirements for new and expanded facilities, and further including minimum one-mile distances between new land waste application sites or new waste impoundments and nearby towns, homes, and schools without written consent;

—Limitations on the application of manure solid and liquid wastes upon land, to

ensure that such land application does not exceed the "agronomic rate of application," which is that rate which is necessary to satisfy the nutritional requirements of the growing plants to strictly minimize leaching into streams and aquifers;

—Remediation of residual soil and groundwater contamination from existing land application activity and use of best available waste management practices;

—Limitations on the storage or impoundment of manure and other wastes to prevent them from being carried to adjoining land by floods or other means, and requiring the covering of open waste lagoons which do not use air or oxygen in their treatment method to minimize, to the greatest extent practicable, odor emissions;

—Minimization, to the greatest extent practicable, of odor emissions from all aspects of such operations;

—Financial assurances, such as bonds, by hog farm owners to ensure that after the final closure of a facility, wastes will be property isolated or disposed of and any spill or contamination cleaned up;

—Immediate notification and written reporting, within 24 hours, of any spill or contamination from an ongoing operation;

—Prohibiting such hog farms from degrading the physical attributes or value of state land board trust lands;

—Continuous monitoring and agronomic analysis of ongoing operations in which land application of waste is used as a disposal method.

The measure states that it does not preclude local governments from imposing requirements that are more restrictive than those contained in the measure. It also authorizes citizen suits by persons who may be adversely affected by the operation of a hog farm and makes conforming amendments to existing statutes that currently exempt animal feeding operations from air quality regulations.

The fiscal impact of this proposal at the state level would consist of approximately $233,000 to pay for new regulatory and enforcement activities, including additional personnel costs, within the department of public health and environment. This amount would be recovered through the assessment of permit fees paid by the owners and operators of hog farms. However, it would count against the state's overall spending limit under article X, section 20 of the Colorado Constitution (the "Taxpayer's Bill of Rights").

The costs to comply with the proposal are indeterminate. If the costs of compliance are substantial, there would probably be some negative fiscal impact to counties on the eastern plains; where hog farms represent a significant part of the local economy. If those costs are not substantial, then no negative fiscal impact to eastern counties would result.