In the Matter of the TITLE, BALLOT TITLE AND SUBMISSION CLAUSE, AND SUMMARY FOR 1999–2000 No. 200A

M. Patrick Steadman, Petitioner,

v.

Sharon Hindman, Gary Rogers, Edward Manring, Respondents,

and

Donetta Davidson, Ken Salazar, And Douglas Brown, Title Board.

No. 99SA368.

Supreme Court of Colorado,
En Banc.

Jan. 24, 2000.

M. Patrick Steadman, Pro Se Denver, Colorado.

King, Peterson, Dymond LLP, Candace McCune, Denver, Colorado, Attorney for Respondents.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Maurice G. Knaizer, Deputy Attorney General, State Services Section, Denver, Colorado, Attorneys for Title Board.

1. The text of the initiative and the titles and summary prepared by the Title Board are ap-

Justice HOBBS delivered the Opinion of the Court.

This is an original proceeding brought pursuant to section 1–40–107(2), 1 C.R.S. (1999). Petitioner M. Patrick Steadman (Steadman), a registered Colorado elector, challenges the action of the Title Setting Board (Title Board) in adopting a title, ballot title, submission clause, and summary (titles and summary) for proposed ballot initiative 1999–2000 # 200A (Initiative # 200A).[1] Initiative # 200A requires a woman's "voluntary and informed consent" before a physician may perform an abortion. Its implementation terms include the delivery of prescribed information to women concerning the abortion procedure at least twenty-four hours before its scheduled occurrence, and annual reporting by physicians to the Colorado Department of Health and Environment (Health Department) regarding the number of women who received the required information. Upholding the Title Board's action, we reject Steadman's contention that Initiative # 200A contains more than one subject in violation of article V, section 1(5.5) of the Colorado Constitution and section 1–40–106.5, 1 C.R.S. (1999).

I.

The Title Board set the titles and summary for Initiative # 200A on October 6, 1999. Steadman filed a motion for rehearing on October 13, 1999. The Title Board affirmed its earlier decision on October 20, 1999. Steadman then filed his petition for review with us on October 27, 1999.

Initiative # 200A proposes to add the "Woman's Right–To–Know Act" to the Colorado Revised Statutes as a new part 3, article 6, title 25. Its provisions require a woman's written certification that she has received the information prescribed by the initiative before a physician may perform an abortion. The referring physician, the physician performing the abortion, or another qualified person must provide the information orally

pended to this opinion.

and in person to the woman at least twenty-four hours prior to the scheduled abortion.

The required information includes: (1) the name of the physician who will perform the abortion, and a detailed description of the abortion procedure and its risks and possible complications; (2) the follow-up medical care that will be provided; (3) the "probable gestational age of the unborn child at the time the abortion is to be performed"; and (4) advice that an "unborn child" with a gestational age of twenty-four weeks "may be able to survive outside the womb," that "the woman has the right to request the physician to use the method of termination of pregnancy that is most likely to preserve the life of the unborn child," and that "the attending physician has the legal obligation to take all reasonable steps necessary to maintain the life and health of the child." Other prescribed information addresses whether the abortion procedure "would be likely to inflict pain upon the unborn child," the availability of benefits and services if the woman chooses to bear the child, and the duty of the father to assist in supporting a child.

Physicians must also inform women planning an abortion that they are free to withhold or withdraw consent to an abortion "at any time before or during the abortion" without affecting rights to future care or treatment and without the loss of any state or federally funded benefits to which they are otherwise entitled. The physician who is to perform the abortion must co-sign the woman's written certification of receipt of the prescribed information, and a physician or other qualified person must be available to answer any questions the woman might have regarding the information she received. Initiative #200A provides differing requirements for informed consent and certification in the event of a medical emergency.

Initiative #200A also requires referring physicians and physicians performing abortions to annually report, on Health Department forms, the number of women who received the prescribed information, how many then obtained the abortion, and how many did not receive the information because of a medical emergency. The Health Department must prepare and distribute to physi-cians certain printed materials and a videotape in English and Spanish for presentation to women. It must also provide to physicians the patient certification and physician reporting forms and to the public an annual statistical report summarizing the information it received from physicians. The Department may not publicly identify the physicians or their patients. Criminal penalties attach to physician non-compliance with the requirements of the proposed "Woman's Right–To–Know Act."

Steadman contends that the reporting requirements of proposed section 25–6–307:(1) have no reasonable or necessary connection to the initiative's purported subject of ensuring a woman's right to informed consent; (2) lack a proper relationship to the subject of the initiative because none of the data compiled by the department is communicated to women contemplating abortion; and (3) burden the right to receive an abortion by overloading doctors with paperwork. He would have us determine that Initiative #200A serves two distinct purposes, "namely mandating certain communication between physicians and their patients seeking abortion services, and collection of statistical data that has no bearing on the communication that takes place in the privacy of the physician-patient relationship."

The Title Board and initiative proponents respond that the data gathering and reporting requirements of Initiative #200A implement and enforce the proposed informed consent act and do not constitute a separate and unconnected subject. We uphold the action of the Title Board in setting the titles and summary for this initiative.

II.

We hold that Initiative #200A does not contravene the single subject requirement of article V, section 1(5.5) and section 1–40–106.5.

A. Court's Role in Single–Subject Review

The right of initiative is a means the citizens have reserved to themselves for proposing change to the constitution and statutes of Colorado. *See Havens v. Board of*

*County Comm'rs,* 924 P.2d 517, 520, 524 (Colo.1996). Our function on appeal of the Title Board's action is to determine whether the titles and summary it has adopted: (1) comply with the single-subject requirement for initiatives; and (2) clearly, accurately, and fairly characterize the proposed initiative. *See In re Proposed Initiative for 1999–2000 # 104,* 987 P.2d 249, 253–54 (Colo.1999). Here, Steadman raises only a single-subject challenge.

Article V, section 1(5.5) of the Colorado Constitution provides:

> No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

Colo. Const. art. V, § 1(5.5).

■ The single-subject and clear title requirements for initiatives embodied in article V, section 1(5.5) first arose in article V, section 21 of the Colorado Constitution, which applies to legislative acts. *See In re Proposed Initiative for 1999–2000 # 25,* 974 P.2d 458, 460 (Colo.1999). As this court noted over 100 years ago with reference to article V, section 21, the purpose of the single-subject requirement is to "prevent[ ] joining in the same act disconnected and incongruous measures." *In re Breene,* 14 Colo. 401, 404, 24 P. 3, 3–4 (1890); *see also In re Proposed Initiative for 1999–2000 # 25,* 974 P.2d at 461 (exploring the genesis of the single-subject requirement).

2. Statutory reporting requirements like the one at issue here generally serve to implement and enforce the substantive provisions of the associated legislative enactment. In the area of public health, statutory reporting provisions often seek to promote the purposes of accompanying substantive legislation by mandating the gathering of empirical data and by prescribing criminal or civil penalties for the failure to comply with both the substantive and reporting provisions of the

■ Our single-subject review of the titles and summary is limited. *See In re Proposed Initiatives for 1999–2000 # # 172–175,* 987 P.2d 243, 245 (Colo.1999). In conducting review of the Title Board's action, we do not engage in policy choice—that is the role of the voters should the initiative qualify for the ballot. Nor do we determine the initiative's efficacy, construction, or future application—that is a matter for judicial determination in a proper case should the voters approve the initiative. *See In re Proposed Initiative for 1997–98 # 30,* 959 P.2d 822, 825 (Colo.1998).

■ In light of the wording of the initiative and the titles, we determine whether the initiative contains a single subject that is clearly expressed in the titles. *See In re "Public Rights in Waters II",* 898 P.2d 1076, 1078–79 (Colo.1995). A measure which has "at least two distinct and separate purposes that are not dependent upon or connected with each other" violates the single-subject requirement. *Id.* (citations omitted).

■ Our cases set forth indicia for determining whether the required linkage exists between the various provisions of the initiative. An initiative does not satisfy the single-subject requirement if its provisions contain separate and unconnected purposes, despite the proponent's effort to unite them under the same general area of law. *See In re Proposed Initiative for 1997–98 # 74,* 962 P.2d 927, 928 (Colo.1998). On the other hand, an initiative that "tends to effect or to carry out one general object or purpose," does satisfy the single-subject requirement. *In re "Public Rights in Water II",* 898 P.2d at 1079.

■ Implementation details that are "directly tied" to the initiative's "central focus" do not constitute a separate subject.[2] *See*

statute. *See* § 25–1–122, 8 C.R.S. (1999) (vesting in the state board of health the power to require physicians to prepare epidemiological reports); § 25–4–203, 8 C.R.S. (1999) (physician reporting of positive syphilis tests for pregnant women); § 25–4–402, 8 C.R.S. (1999) (physician reporting of diagnoses of venereal disease); § 25–4–502, 8 C.R.S. (1999) (physician reporting of tuberculosis cases); § 25–4–603, 8 C.R.S. (1999) (physician reporting of animal bites); § 25–4–1402, 8

*In re Initiative for 1997–98 # 74,* 962 P.2d at 929. For example, in *In re Initiative for 1997–98 # 113,* 962 P.2d 970 (Colo.1998) (per curiam), we upheld the titles and summary for a proposed initiative to limit pollution from hog farms. Its implementation measures included provisions for reporting waste disposal information to the Health Department. *See id.* at 972; *see also* § 25–8–501.1, 8 C.R.S. (1999) (codifying initiative). In *In re Petitions,* 907 P.2d 586 (Colo.1995), we determined that a proposed initiative establishing comprehensive rules governing petitions did not violate the single-subject requirement by its inclusion of detailed procedures and its authorization for citizen lawsuits to ensure compliance. We held that these provisions implemented and enforced the initiative's single subject rather than establishing a distinct and disconnected subject. *See id.* at 591.

In sum, the single-subject requirement prohibits the Title Board from setting the titles and summary for an initiative which contains (1) at least two distinct or separate purposes that (2) are not dependent upon or connected with each other. *See In re "Public Rights in Waters II,"* 898 P.2d at 1078–79; *see also In re Initiative for 1999–2000 # 104,* 987 P.2d at 258.

### B. Titles and Summary for Initiative # 200A

A principal object of our single-subject review is to "preserve and protect the right of initiative and referendum." § 1–40–106.5. We do so by examining the initiative's wording to determine whether it contains more than one subject.

Steadman argues that Initiative # 200A contains separate, unconnected subjects because: (1) it governs communication between physicians and their patients who seek abortion services; and (2) it requires physicians to compile and report data that is not used in the physician-patient communication. He asserts that Initiative # 200A seeks not only to regulate the content of the informed consent communication between physician and patient, but also to burden abortion providers

with data gathering and reporting provisions designed to discourage them from providing abortion services.

 This argument invites us to speculate on the motivations of initiative proponents or to construe the legal effect of the initiative as if it were law; neither is within the scope of our single-subject review. Rather, we must determine whether or not the implementation provisions tend "to effect or to carry out" the "one general object or purpose of the initiative." *In re "Public Rights in Water II",* 898 P.2d at 1079. We do so by examining whether the implementation provisions are directly tied to the central focus of the initiative. *See In re Proposed Initiative for 1997–98 # 74,* 962 P.2d at 929. An initiative is not transformed into a multi-subject proposal simply because it specifies mechanisms for carrying out the initiative's single subject. *See id.*

 We hold that Initiative # 200A encompasses a single subject, i.e., that a woman must provide her written "voluntary and informed consent" before a physician may perform an abortion. The initiative's information delivery, data gathering, and reporting requirements are all connected to this single purpose. First, the detailed information physicians must deliver relates to a woman's understanding of the abortion procedure, its effect upon her and her fetus, and options to an abortion—all of which bear on her informed consent as defined by the proposed statute. Second, the physician data gathering requirement implements the informed consent purpose by reminding physicians, in every case they handle, to deliver the prescribed information to each patient or ascertain the existence of an exempted emergency as defined by the proposed statute. Third, the physician reporting provision enforces the informed consent requirement by requiring annual documentation to the Health Department of a physician's compliance with the information delivery and signed consent provisions of the proposed statute. Thus, the implementation provisions are directly tied to the initiative's ascertainable central focus:

C.R.S. (1999) (physician reporting of HIV and AIDS diagnoses); § 25–4–1903, 8 C.R.S. (1999)

(physician reporting of cases of gulf war syndrome).

ensuring a woman's "voluntary and informed consent."

■ Initiative # 200A proposes to enact a statute rather than a constitutional provision. Statutes often include implementation details, while constitutional provisions generally provide authority, impose restrictions, and point the way to the three branches of government in fulfilling their assigned powers and duties. The General Assembly is yearly engaged in the legislative pursuit of spelling out implementation details for policy it enunciates and assigns to administrative agencies for enforcement. We must review statutes that the citizens propose to enact according to the same standards we use for single-subject review of statutes the General Assembly enacts. *See In re Breene,* 14 Colo. at 404, 24 P. at 3–4; *see also In re Proposed Initiative # 25,* 974 P.2d at 461.

An example of physician data gathering and reporting provisions the legislature has tied to physician abortion services is section 26–15–104.5(4)(a), 8 C.R.S. (1999). This provision requires physicians to compile and report to the Health Department certain information relating to the provision of "necessary medical services" to "preserve the lives of a pregnant woman and her unborn child" in regard to publically funded abortions. *See* § 26–15–104.5(1), (2) (implementing Colo. Const. art. V, § 50). While we have not reviewed the General Assembly's statute for compliance with the single-subject requirement, we observe that its design—like the initiative before us—includes physician documentation and reporting to the Health Department as mechanisms to enforce an abortion services purpose.

Conscious of our duties not to make legislative policy and to avoid pronouncing on the possible legal effect of a proposed initiative, *see In re Initiative 1999–2000 # 104,* 987 P.2d at 254, we hold that Initiative # 200A meets the single-subject requirements of article V, section 1(5.5) of the *Colorado Constitution* and section 1–40–106.5, 1 C.R.S. (1999).

3. Women's Health Information Act.

### III.

Accordingly, we affirm the action of the Title Board in setting the titles and summary for Initiative 1999–2000 # 200A.

### APPENDIX

Proposed Initiative "1999–2000 # 200A" [3]

The title as designated and fixed by the Board is as follows:

AN AMENDMENT TO THE COLORADO REVISED STATUTES CONCERNING THE REQUIREMENT THAT ANY WOMAN WHO IS CONSIDERING AN ABORTION GIVE VOLUNTARY, INFORMED CONSENT PRIOR TO THE ABORTION, AND, IN CONNECTION THEREWITH, DEFINING SEVERAL PERTINENT TERMS SO THAT "ABORTION" INCLUDES TERMINATION OF A KNOWN PREGNANCY AT ANY TIME AFTER CONCEPTION, SPECIFYING THE INFORMATION A PHYSICIAN MUST PROVIDE TO INSURE THAT A WOMAN'S CONSENT TO AN ABORTION IS VOLUNTARY AND INFORMED, REQUIRING A PHYSICIAN, EXCEPT IN EMERGENCY CASES, TO PROVIDE THE SPECIFIED INFORMATION TO THE WOMAN AT LEAST TWENTY–FOUR HOURS PRIOR TO PERFORMING AN ABORTION, REQUIRING THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT TO PROVIDE SPECIFIED INFORMATIONAL MATERIALS FOR WOMEN WHO ARE CONSIDERING ABORTIONS, ESTABLISHING PROCEDURES FOR EMERGENCY SITUATIONS, REQUIRING PHYSICIANS TO ANNUALLY REPORT SPECIFIED INFORMATION, REQUIRING THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT TO ANNUALLY PUBLISH A COMPILATION OF THE PHYSICIANS' REPORTS, AND PROVIDING FOR THE ADMINISTRATION AND ENFORCEMENT OF THE AMENDMENT'S PROVISIONS.

The ballot title and submission clause as designated and fixed by the Board is as follows:

SHALL THERE BE AN AMENDMENT TO THE COLORADO REVISED STATUTES CONCERNING THE REQUIREMENT THAT ANY WOMAN WHO IS CONSIDERING AN ABORTION GIVE VOLUNTARY, INFORMED CONSENT PRIOR TO THE ABORTION, AND, IN CONNECTION THEREWITH, DEFINING SEVERAL PERTINENT TERMS SO THAT "ABORTION" INCLUDES TERMINATION OF A KNOWN PREGNANCY AT ANY TIME AFTER CONCEPTION, SPECIFYING THE INFORMATION A PHYSICIAN MUST PROVIDE TO INSURE THAT A WOMAN'S CONSENT TO AN ABORTION IS VOLUNTARY AND INFORMED, REQUIRING A PHYSICIAN, EXCEPT IN EMERGENCY CASES, TO PROVIDE THE SPECIFIED INFORMATION TO THE WOMAN AT LEAST TWENTY–FOUR HOURS PRIOR TO PERFORMING AN ABORTION, REQUIRING THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT TO PROVIDE SPECIFIED INFORMATIONAL MATERIALS FOR WOMEN WHO ARE CONSIDERING ABORTIONS, ESTABLISHING PROCEDURES FOR EMERGENCY SITUATIONS, REQUIRING PHYSICIANS TO ANNUALLY REPORT SPECIFIED INFORMATION, REQUIRING THE DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT TO ANNUALLY PUBLISH A COMPILATION OF THE PHYSICIANS' REPORTS, AND PROVIDING FOR THE ADMINISTRATION AND ENFORCEMENT OF THE AMENDMENT'S PROVISIONS?

The summary prepared by the Board is as follows:

This measure creates a new part 3 to article 6 of title 25, Colorado Revised Statutes, which would be known and cited as the "Woman's Right–To–Know Act". The measure specifies the people's intent, in adopting the measure, to recognize the psychological and physical effects of having an abortion, to insure the provision of complete and accurate information to allow a woman to make an informed choice as to whether to give birth or to have an abortion, to inform women of the limited services currently provided by clinics that provide abortions, and to insure that a woman's decision to have an abortion is truly an informed decision.

The measure defines several pertinent terms, including "abortion", "pregnancy", and "unborn child".

The measure requires a woman to give voluntary, informed consent before undergoing an abortion. To ensure that the woman's consent is voluntary and informed, the measure requires a physician, or in some circumstances a qualified person, to provide certain information orally and in person to a woman at least twenty-four hours prior to the time that she has an abortion and specifies the information that must be conveyed. The measure requires any woman who is considering an abortion to certify in writing that she has received the required information. The measure further requires that the physician performing the abortion review and sign the woman's written certification. The measure prohibits any facility from requiring a woman to pay for any services until the twenty-four-hour period immediately preceding the abortion has expired.

The measure requires the department of public health and environment, beginning ninety days after the effective date of the measure, to publish, annually update, and provide free upon request printed materials and an informational videotape concerning the agencies and services available to assist pregnant women, the support obligations of the father, the anatomical and physiological characteristics of unborn children at various gestational stages, and various abortion procedures. The measure requires that the informational materials and videotape shall be available at no cost to any individual, physician, facility, or hospital.

The measure makes an exception to the information requirements in emergency circumstances where an abortion is necessary to save the life or avert impairment of the mother. In these cases, a physician may perform an abortion without first providing the specified items of information, although the physician, prior to the abortion if possible, must inform the woman of the medical indications necessitating the abortion. The

measure requires the physician in these emergency circumstances to certify the nature of the emergency which necessitated a waiver of the informational requirements.

The measure requires the department of public health and environment, within ninety days after the effective date of the measure, to prepare a form by which physicians will report:

1. The number of women to whom the physician provided the abortion information;

2. The number of women who received a copy of the printed informational materials, the number of women who did not accept the materials, and the number of women who went on to have an abortion; and,

3. The number of abortions performed by the physician under emergency circumstances.

The measure requires each physician or qualified person who provided abortion information to complete the reporting form and submit it to the department of public health and environment by February 28 of each year. The measure requires any physician who fails to turn in the form by the deadline to pay a fine of twenty dollars per day. The measure requires the department to file an action to compel compliance with the reporting requirement if a physician fails to submit a report within one year following the due date. The measure requires the department of public health and environment, by June 30, 2002, to annually issue a report of nonidentifying statistics compiled from the physician reports. The measure allows the department to alter the reporting and publishing dates as necessary for fiscal savings, so long as reports are submitted and published at least once each year.

The measure makes it a class 5 felony to perform an abortion in violation of the provisions of the measure or to fraudulently alter or sign the certification that the required information was provided. The measure makes it a class 1 misdemeanor for a physician to fail to comply with the reporting requirements of the measure. The measure protects any woman who has an abortion from assessment of any criminal or civil penalty for violation of the measure.

The measure provides that failure by a physician to comply with the provisions of the initiative constitutes grounds for a civil action and a professional disciplinary action against the physician. If the department of public health and environment fails to publish the annual report, the measure allows any group of five or more persons to seek an injunction against the executive director of the department to require publishing of the report. The measure provides that failure to abide by such a court order shall subject the executive director to sanctions for civil contempt.

The measure allows an award of attorney fees to the plaintiff if he or she prevails in a civil action brought to enforce the provisions of the measure and allows an award of attorney fees to the defendant in such a suit if the defendant prevails and the court finds that the plaintiffs suit was frivolous and brought in bad faith.

The measure specifies that it shall not be construed to create or recognize a right to an abortion and that it is not the intent of the measure to make lawful any abortion or method of abortion that is currently or becomes unlawful. The measure specifies that its provisions are severable and that declaration of the invalidity of any portion of the measure shall not affect the validity of the remainder of the measure. The measure provides that it shall take effect upon proclamation of the vote by the governor.

The Department of Local Affairs has determined that there would be no fiscal impact on local governments in Colorado resulting from implementation of the measure.

The Office of State Planning and Budgeting has determined that implementation of the measure would result in a negative fiscal impact on the department of public health and environment in the amount of $327,125 in FY 2000-01 and $175,569 in FY 2001-02. These amounts include:

1. Development, production, and distribution of video and audio materials;

2. Personal services costs equal to 2.75 FTE in the first year and 1.25 FTE in the second year; and

3. Legal expenses for enforcement of the measure.

Single subject approved; staff draft amended; hearing adjourned October 6, 1999 at 5:20 p.m.

Motion for rehearing denied; hearing adjourned October 20, 1999 at 2:35 p.m.

The text of Initiative # 200A is as follows:

**Be it Enacted by the People of the State of Colorado:**

Article 6 of Title 25, Colorado Revised Statutes, is AMENDED BY THE ADDITION OF A NEW PART 3 to read:

## PART 3

### Woman's Right to Know Act

**25-6-301. Short Title.** This part 3 shall be known and may be cited as the "Woman's Right–To–Know Act".

**25-6-302. Intent of the people.** (1) The People of Colorado, by enactment of this part 3, hereby find, determine, and declare that:

(a) It is essential to the psychological and physical well-being of a woman who is considering an abortion that she receives complete and accurate information on her alternatives: giving birth or having an abortion.

(b) The knowledgeable exercise of a decision by a woman regarding abortion depends on the extent to which the woman receives sufficient information to make an informed choice between the two alternatives.

(c) A high percentage of abortions are performed in clinics devoted solely to providing abortions and family planning services. Most women who seek abortions at these facilities do not have any historical or future relationship with the physician who performs the abortion. In some cases they do not return to the facility for post-surgical care. In most instances, the woman's only contact with the physician occurs at the time of the abortion procedure, with little or no opportunity to receive counseling concerning her decision.

(d) The decision to abort "is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of the nature and consequences." Planned Parenthood v. Danforth, 428 U.S. 52, 67 (1976).

(e) "The medical, emotional, and psychological consequences of an abortion are serious and can be lasting ..." H.L. v. Matheson, 450 U.S. 398, 411 (1981).

(2) Based on the findings in subsection (1) of this section, it is the purpose of this part 3 to:

(a) Ensure that every woman considering an abortion receive complete information on her alternatives and that every woman submitting to an abortion do so only after giving her voluntary and informed consent to the abortion procedure;

(b) Protect unborn children from a woman's uninformed decision to have an abortion;

(c) Reduce "the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." Planned Parenthood v. Casey, 112 S.Ct. 2791, 2823 (1992).

(d) Adopt the construction of the term "Medical Emergency" accepted by the U.S. Supreme Court in Planned Parenthood v. Casey. 112 S.Ct. 2791,(1992)

**25-6-303. Definitions.** As used in this part 3 only, unless otherwise defined elsewhere within this part 3:

(1) "Abortion" means the act of using or prescribing any instrument, medicine, drug, or any other substance or device with the intent to terminate the pregnancy of a woman known by the person performing the abortion to be pregnant. Such use or prescription is not an abortion with the intent to:

(a) save the life or preserve the health of an unborn child;

(b) remove an unborn child dead of natural causes; or

(c) deliver alive an unborn child prematurely in order to preserve the health of both the pregnant woman and her unborn child.

(2) "Complication" means that condition which includes, but is not limited to: hemorrhage, infection, uterine perforation, cervical

laceration, pelvic inflammatory disease, endometritis, and retained products. The State Board of Health may further include additional specific "complications" pursuant to section 25-1-108.

(3) "Conception" means the fusion of a human spermatazoon with a human ovum.

(4) "Department" means the Colorado Department of Public Health and Environment.

(5) "Facility" or "medical facility" means any public or private hospital, clinic, center, medical school, medical training institution, health care facility, physician's office, infirmary, dispensary, ambulatory surgical treatment center or other institution or location wherein medical care is provided to any individual.

(6) "First trimester" means the first twelve weeks of gestation.

(7) "Gestational age" means the age of an unborn child as calculated from the first day of the last menstrual period of the pregnant woman, or any other medically accepted method for determining gestational age.

(8) "Hospital" means an institution licensed for health treatment pursuant to section 25-1-107(1)(l)(I).

(9) "Medical emergency" means that condition which, on the basis of the physician's good-faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

(10) "Physician" means any person licensed to practice medicine in this state.

(11) "Pregnant" or "pregnancy" means that female reproductive condition of having an unborn child in the woman's body.

(12) "Qualified person" means an agent of the physician who is a psychologist licensed pursuant to part 3 of article 43 of title 12, C.R.S., a social worker licensed pursuant to part 4 of article 43 of title 12, C.R.S., a registered nurse licensed pursuant to article 38 of title 12, C.R.S., a physician licensed pursuant to part 1 of article 36 of title 12, C.R.S., or a physician assistant certified pursuant to 12-36-106(5), C.R.S.

(13) "Unborn child" means the offspring of human beings from conception until birth.

(14) "Viability" means the state of fetal development when, in the judgment of the physician based on the particular facts of the case before him or her and in light of the most advanced medical technology and information available to him or her, there is a reasonable likelihood of sustained survival of the unborn child when removed from the body of his or her mother, with or without artificial life support.

(15) "Woman" or "mother" means any female human individual who is pregnant.

**25-6-304. Informed Consent Required.** (1) The voluntary and informed consent of the woman upon whom an abortion is to be performed or induced shall be required before an abortion may be performed upon that woman. Except in the case of a medical emergency, consent to an abortion is determined to be voluntary and informed if and only if:

(a) At least twenty-four hours before the abortion, the physician who is to perform the abortion or the referring physician has informed the woman, orally and in person, of the following:

(i) The name of the physician who will perform the abortion;

(ii) A medically accurate and complete description of the proposed abortion method and of its risks including, but not limited to, the risks of infection, hemorrhage, danger to subsequent pregnancies, breast cancer, the possible adverse psychological effects associated with an abortion, and alternatives to the abortion which a reasonable patient would consider material to the decision of whether or not to undergo the abortion;

(iii) Information concerning the follow-up medical care which is provided by the clinic;

(iv) Accurate information about symptoms of possible complications and how to respond to those complications;

(v) The probable gestational age of the unborn child at the time the abortion is to be

performed, and that if the unborn child is viable or has reached the gestational age of twenty-four weeks, the unborn child may be able to survive outside the womb; that the woman has the right to request the physician to use the method of termination of pregnancy that is most likely to preserve the life of the unborn child; and that, if the unborn child is born alive, the attending physician has the legal obligation to take all reasonable steps necessary to maintain the life and health of the child.

(vi) The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed, including whether the procedure would be likely to inflict pain upon the unborn child;

(vii) The medical risks associated with carrying her unborn child to term; and

(viii) Any need for anti-Rh immune globulin therapy if she is Rh negative, the likely consequences of refusing such therapy, and the cost of the therapy.

(b) At least twenty-four hours before the abortion, the physician who is to perform the abortion, the referring physician, or a qualified person has informed the woman, orally and in person, that:

(i) Medical assistance benefits may be available for prenatal care, childbirth, and neonatal care, and that more detailed information on the availability of such assistance is contained in the printed materials and informational videotape given to her and described in section 25–6–305.

(ii) The printed materials and informational videotape in section 25–6–305 describe the unborn child and list agencies which offer alternatives to abortion.

(iii) The father of the unborn child is liable to assist in the support of this child, even in instances where he has offered to pay for the abortion. In the case of rape or incest, this information may be omitted.

(iv) She is free to withhold or withdraw her consent to the abortion at any time before or during the abortion without affecting her right to future care or treatment and without the loss of any state or federally funded benefits to which she might otherwise be entitled.

(c) The information in paragraphs (a) and (b) of this subsection 1 is provided to the woman individually and in a private room to protect and maintain the privacy and confidentiality of her decision and to ensure that the information focuses on her individual circumstances and that she has adequate opportunity to ask questions.

(d) At least twenty-four hours before the abortion, the woman is given a copy of the printed materials and a viewing or a copy of the informational video described in subsection 25–6–305(1)(f) by the physician who is to perform the abortion, the referring physician, or a qualified person. If the woman is unable to read the materials, they shall be read to her if she so desires. If the woman asks questions concerning any of the information or materials, answers shall be provided to her by a physician or qualified person in a language she can understand.

(e) The woman certifies in writing on a department created or approved checklist form provided by a physician or qualified person prior to the abortion that the information required to be provided under paragraphs (a) and (b) of this subsection 1 has been provided, and that materials described in paragraph (d) of this subsection 1 have been offered to the woman.

(f) Except in the case of a medical emergency pursuant to section 25–6–306, the physician who is to perform the abortion, prior to performing the abortion, receives and signs a copy of the written certification prescribed in paragraph (e) of this subsection 1. In the event of a medical emergency, the physician performing the abortion shall sign, after the abortion is performed, and clearly state on the checklist certification form the nature of the medical emergency which necessitated the waiving of the informed consent requirement of this section. Copies of the signed certification shall be permanently filed in both the records of the physician performing the abortion and the records of the facility where the abortion takes place. The woman upon whom the abortion is performed shall also receive a copy of the signed certification form.

(g) The woman is not required to pay any amount for the abortion procedure until the twenty-four hour reflection period has expired.

(2) Provision of information required by this section shall commence no later than ninety days following the effective date of this part 3 in order to provide the specified time for the department to publish materials and forms pursuant to section 25-6-305, and to distribute them.

**25-6-305. Publication of materials.** (1) Within ninety days after the effective date of this part 3, the department shall cause printed materials and an informational videotape to be published in both English and Spanish. The department shall update, on an annual basis, the following easily comprehendible printed materials and informational videotape:

(a) Geographically indexed materials which inform the woman of public and private agencies and services available to assist a woman through pregnancy, during childbirth, and while her child is dependent, including, but not limited to, adoption agencies. The materials shall include a comprehensive list of the agencies, a description of the services they offer, and the telephone numbers and addresses of the agencies, and shall inform the woman about available medical assistance benefits for prenatal care, childbirth, and neonatal care. The department shall ensure that the materials described in this section are comprehensive and do not directly or indirectly promote, exclude, or discourage the use of any agency or services described in this section. The materials shall also contain a toll-free, twenty-four-hour-a-day telephone number established and maintained by the department which may be called to obtain audibly such a list and description of agencies in the locality of the caller and of the services they offer. The materials shall also state that any physician who performs an abortion upon a woman without her informed consent may be liable to her for damages in a civil action at law and that the appropriate adoption court may permit adoptive parents to pay costs of prenatal care, childbirth, and neonatal care. The ma-

terials shall include the following statement in both English and Spanish: "There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or to place him or her for adoption. The State of Colorado strongly urges you to contact one or more of these agencies before making a final decision about abortion. The law requires that your physician or his or her agent give you the opportunity to call agencies like these before you undergo and abortion."

(b) Materials which include information on the obligations of the father to support his child who is born alive, including but not limited to the father's legal duty to support his child, which may include child support payments and health insurance, and the fact that paternity may be established either by the fathers signature on an acknowledgment of paternity or by court action. A statement that more information concerning paternity establishment and child support services and enforcement may be obtained by calling state or county public assistance agencies. A list of such agencies shall be included.

(c) Materials which inform the pregnant woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from conception to full term, including photographs representing the development of an unborn child at two-week gestational increments. The descriptions shall include information about brain and heart function, the presence of external members and internal organs during the applicable stages of development and any relevant information on the possibility of the unborn child's survival. Any such photographs must contain the dimensions of the unborn child and must be realistic. The materials shall be objective, nonjudgmental, and designed to convey only accurate scientific information about the unborn child at various gestational ages.

(d) Materials which contain objective information describing the abortion procedures commonly employed and the medical risks commonly associated with each such procedure, which shall be medically accurate and

complete including, but not limited to, the risks of infection, hemorrhage, danger to subsequent pregnancies, breast cancer, the possible adverse psychological effects associated with an abortion, and the medical risks associated with carrying a child to term;

(e) A checklist certification form to be used by the physician or a qualified person pursuant to subsection 25–6–304(1)(c), which will list all the items of information which are to be offered to the woman by a physician or a qualified person pursuant to this part 3.

(f) A standardized videotape which may be used statewide, produced by the department and containing all of the information described in subsections (1)(a), (1)(b), (1)(c), and (1)(d) of this section, in accordance with the requirements of those subsections. In preparing the videotape, the department may summarize and make reference to the printed comprehensive list of geographically indexed names and services described in subsection (1)(a) of this section. The videotape, in addition to the information described in subsections (1)(a), (1)(b), (1)(c), and (1)(d) of this section, shall show an ultrasound image of the heartbeat of an unborn child four to five weeks gestational age, at six to eight weeks gestational age, and each month thereafter. That information shall be presented in an objective, unbiased manner designed to convey only accurate scientific information.

(2) The materials required under this section shall be printed in a typeface large enough to be clearly legible.

(3) The materials required under this section and the videotape described in subsection (1)(f) of this section shall be available from the department at no cost upon request and in an appropriate number to any individual, physician, facility, or hospital.

**25–6–306. Procedure in case of medical emergency.** When a medical emergency compels the performance of an abortion, the physician shall inform the woman, prior to the abortion if possible, of the medical indications supporting the physician's judgment that an abortion is necessary to avert her death or that a twenty-four hour delay will create serious risk of substantial and irre-

versible impairment of a major bodily function of the woman.

**25–6–307. Reporting requirements.** (1) Within ninety days after the enactment of this part 3, the department shall prepare a reporting form for physicians containing a reprint of this part 3 and listing:

(a) The number of females to whom the physician provided the information described in section 25–6–304; and, of that number, the number which was provided in the capacity of referring physician and the number provided in the capacity of the physician performing the abortion.

(b) The number of females to whom the physician, the referring physician or the qualified person provided the information described in subsection 25–6–304(1)(b); and, of that number the number provided in the capacity of the referring physician and the number provided in the capacity of a physician who is to perform the abortion; and, of each of those numbers, the number provided by the physician and the number provided by a qualified person.

(c) The number of females who received a copy of the printed information described in section 25–6–305, and the number who did not; and of each of those numbers, the number who, to the best of the reporting physician's information and belief, went on to obtain the abortion; and

(d) The number of abortions performed by the physician in which information otherwise required to be provided at least twenty-four hours before the abortion was not so provided because an immediate abortion was necessary to avert the female's death, and the number of abortions in which such information was not so provided because a delay would create serious risk of substantial and irreversible impairment of a major bodily function.

(2) The department shall ensure that copies of the reporting forms described in subsection (1) of this section are provided:

(a) within ninety days after this part 3 is enacted, to all physicians licensed to practice in this state;

(b) to each physician who subsequently becomes newly licensed to practice in this state, at the same time as official notification to that physician that the physician is so licensed; and

(c) by December 1 of each year, other than the calendar year in which forms are distributed in accordance with subsection (2)(a) or (b) of this section, to all physicians licensed to practice in this state.

(3) By February 28 of each year following a calendar year in any part of which this part 3 was in effect, each physician who provided, or whose qualified person provided, information to one or more females pursuant to section 25–6–304 during the previous calendar year shall submit to the department a copy of the form described in subsection (1) of this section, with the requested data entered accurately and completely.

(4) The physician shall pay to the department a fee of twenty dollars per day for each day after the February 28 deadline the physician's reporting form is late. If any physician required to report under this part 3 has not submitted a report, or has submitted only an incomplete report, more than one year following the due date, the department shall within 30 days file an action to compel compliance.

(5) On or before June 30 of the year 2002, and every June 30 thereafter, the department shall issue a public report providing statistics for the previous calendar year compiled from all of the reports covering that year submitted in accordance with this section for each of the items listed in subsection (1) of this section. Each such report shall also provide the statistics for all previous calendar years, adjusted to reflect any additional information from late or corrected reports. Pursuant to section 25–1–108, the department shall take care to ensure that none of the information included in the public reports could reasonably lead to the identification of any individual provided information pursuant to subsections 25–6–304(1)(a) and (1)(b).

(6) Pursuant to section 25–1–108, the department may alter the dates established by subsections (2)(c), (3) or (5) of this section or consolidate the forms or reports described in this section with other forms or reports to achieve administrative convenience of fiscal savings or to reduce the burden of reporting requirements, so long as reporting forms are sent to all licensed physicians in the state at least once every year and the report described in subsection (5) is issued at least once every year.

**25–6–308. Criminal Penalties.** (1) Any person who knowingly or recklessly performs or attempts to perform an abortion in violation of this part 3 shall be guilty of a class 5 felony.

(2) Any person who knowingly or recklessly violates this part 3, or who fraudulently alters or signs the certification required in subsections · 25–6–304(5) and (6) shall be guilty of a class 5 felony.

(3) Any physician who knowingly or recklessly submits a false report under subsection 25–6–307(3) shall be guilty of a class 1 misdemeanor.

(4) No civil or criminal penalty may be assessed against the female upon whom the abortion is performed or attempted to be performed for the violation of any provision of this part 3.

**25–6–309. Civil Remedies.** (1) In addition to whatever remedies are available under the common or statutory law of the state of Colorado, failure to comply with the requirements of this part 3 shall:

(a) Provide a basis for a civil malpractice action. Any violation of this part 3 shall be admissible in a civil suit as prima facie evidence of failure to obtain an informed consent. When requested, the court shall allow a woman to proceed using solely her initials or a pseudonym and may close any proceedings in the case and enter other protective orders to preserve the privacy of the woman upon whom the abortion was performed.

(b) Provide a basis for professional disciplinary action against the physician or other qualified person.

(2) If the department fails to issue the report required by subsection 25–6–307(5), any group of five or more citizens of this state may seek an injunction in a court of

competent jurisdiction against the presiding director of the department requiring that a complete report be issued within a period stated by court order. Failure to abide by such an injunction shall subject the presiding director to sanctions for civil contempt.

(3) If judgment is rendered in favor of the plaintiff in any action described in this section, the court shall also order reasonable attorney's fees in favor of the plaintiff against the defendant. If judgment is rendered in favor of the defendant and the court finds that the plaintiff's suit was frivolous and brought in bad faith, the court shall also order reasonable attorney's fees in favor of the defendant against the plaintiff.

**25–6–310. Construction.** (1) Nothing in this part 3 shall be construed as creating or recognizing a right to abortion.

(2) It is not the intent of this part 3 to make lawful an abortion or method of abortion that is or becomes unlawful.

**25–6–311. Severability.** The provisions of this part 3 are declared to be severable, and, if any provision, word, phrase, or clause herein or the application thereof to any person shall be held invalid, such invalidity shall not affect the validity of the remaining portions.

**25–6–312. Effective date.** This part 3 shall take effect upon proclamation of the vote by the governor.